648 So.2d 1116 (1994)
Althea Grayson BANKS
v.
Earle Stewart BANKS, Sr.
No. 92-CA-01133.
Supreme Court of Mississippi.
December 1, 1994.
As Modified on Denial of Rehearing February 2, 1995.
*1117 Deborah McDonald, Natchez, Melvin Wade Granberry, St. Louis, MO, for appellant.
Halbert E. Dockins, Jr., Thomas J. Lowe, Jr., Jackson, for appellee.
En Banc.
SMITH, Justice, for the Court:
This is an appeal from the Chancery Court of the First Judicial District of Hinds County. Althea Grayson Banks was found in contempt of court for failing to execute joint tax returns with her ex-husband and held liable for $32,323.00, the amount of additional taxes which were alleged to have been caused by her failure to sign the joint tax returns.
Mrs. Banks appeals from the judgment of the lower court and raises the following issues:
I. WHETHER THE SPECIAL MASTER ERRED IN CONSTRUING A PROPERTY SETTLEMENT AGREEMENT ENTERED INTO BY THE PARTIES IN A DIVORCE PROCEEDING TO REQUIRE A WIFE TO SIGN JOINT TAX RETURNS WHERE THE PARTIES ONLY AGREED TO "COOPERATE WITH EACH OTHER IN THE FILING OF ALL TAX RETURNS."
II. WHETHER THE SPECIAL MASTER ERRED IN IMPOSING A JUDGMENT AGAINST MRS. BANKS FOR TAX LIABILITY BASED UPON THE DIFFERENCE BETWEEN WHAT MR. BANKS WOULD HAVE OWED HAD HE FILED A JOINT RETURN WITH MRS. BANKS INSTEAD OF A MARRIED FILING SEPARATELY RETURN, WHERE SHE NEVER HAD AN OPPORTUNITY TO BE A PARTY TO THE TAX COURT PROCEEDINGS ASSESSING MR. BANKS' TAX LIABILITY.
Finding that the lower court erred, this Court reverses the judgment against Mrs. Banks.

THE FACTS
The parties were divorced on May 25, 1990, on the grounds of irreconcilable differences. The central issue in the case sub judice is the parties interpretation of a clause of the settlement agreement which was prepared by Mr. Banks' attorney. The property settlement agreement included the following paragraph:
The parties agree that the Husband is entitled to and shall claim the children as his exemptions for state and federal income tax purposes until the Wife's income reaches Eighteen Thousand Dollars ($18,000.00) annually, so long as he remains current with his child support payments. Upon such happening, the Wife shall be entitled to claim Kimberly Celeste Banks as her exemption for state and federal income tax purposes, and the Husband shall be entitled to claim Earle Stewart Banks, Jr. as his exemption for state and federal income tax purposes. The parties further agree to cooperate with each other *1118 in the filing of all tax returns which may now be due through the tax year 1989.
At the time of the Earle and Althea Banks' divorce, they had not filed income tax returns for the years 1982 through 1989. First, the IRS pursued Mrs. Banks for back taxes due from her failure to file tax returns. Mrs. Banks settled her own tax liability with the IRS for 1983 and 1984, the only years she had separate income.
When the Internal Revenue Service discovered that Mr. Banks had not filed tax returns for the years 1982 through 1986 and brought him into United States Tax Court, Mr. Banks entered into an agreement to pay the taxes for those years. It was determined that Mr. Banks could substantially reduce his tax liability if he could get his ex-wife to sign the returns as joint tax returns. At the time of Mr. Banks' agreement with the IRS on February 11, 1992, he had thirty days in which to secure the signature of Mrs. Banks on the tax returns.
When Mrs. Banks refused to voluntarily sign, Mr. Banks filed a "Motion to Find Respondent in Contempt and for Affirmative Relief" in Hinds County Chancery Court on February 26, 1992. Mr. Banks alleged that he had "made numerous attempts to obtain the respondent's cooperation regarding the execution of joint tax returns for the taxable years 1982-1989, yet the respondent has consistently and steadfastly refused to execute the returns." Mr. Banks sought to have Mrs. Banks found in contempt for her refusal to honor the terms of the settlement agreement and to compel her to sign.
On March 4, 1992, Chancellor Patricia Wise appointed Bobby Sneed as Special Master to consider the matter, and a hearing was scheduled for March 5, 1992. The hearing was subsequently postponed until March 9, 1992, due to a conflict of Mrs. Bank's counsel.
At the March 9 hearing, Mr. Banks testified that he contacted his ex-wife on February 7 at St. Richard's Junior High School where his daughter and son are in school and asked her to sign the joint tax returns. This was the first time he had talked to her about signing a joint return since their divorce in 1990. She told him at that time that she had already been called in by the IRS herself and had settled her liability. Mr. Banks testified that he offered to reimburse her for the taxes she had already paid if she would agree to sign and she said that she "would have to think about it." Mr. Banks said he talked to her several times thereafter.
Mr. Banks last talked to Mrs. Banks about signing the tax returns on February 18. At that time the tax returns were in rough draft and he did not have any documents when he talked to her. The tax returns were signed by the CPA on February 21 and were not sent to Mrs. Banks' attorney until March 5, 1992.
On February 26, 1992, Mr. Banks' attorney sent a letter offering to reimburse Mrs. Banks for the taxes she had already paid and asking for receipts showing the tax payments so these could be included in the tax returns.
When asked if Mrs. Banks had signed a joint tax return during their marriage, Mr. Banks could not remember. He stated that Lamar Beacham had prepared the tax returns and normally would sign Mr. Banks' name and Mrs. Banks' name "because it was always late." Mr. Banks testified that Mr. Beacham had died and had not finished the tax returns for the years in question.
Harris H. Barnes, III, Mr. Banks' tax attorney, testified he had been retained to represent Mr. Banks in tax court only thirteen days before the tax deficiency case was to go to trial. Barnes was able to settle the case before trial. The decision order was filed based on "married filing separately" status because it was not certain that Mrs. Banks would sign a joint return, but a written agreement was obtained from the IRS that if within thirty days following the decision order Mrs. Banks would agree to file and sign joint returns, that the decision order would be amended to reflect married filing jointly.
Barnes testified that he and the CPA's had "not done the interest computations or the penalty computations, just the pure tax." He stated that the difference in taxes between married filing singly and married filing jointly was "approximately $11,400.00 more in tax" and "when you add the interest and then *1119 add an additional fifty percent of the interest and all of the other penalties, the tax, interest and penalties would then go by half again more, the bottom line being in excess of $20,000.00 extra."
When asked about Mrs. Banks' potential criminal liability or civil fraud liability, Barnes testified that her criminal liability would be "zip." "Her civil exposure is the same as any other jointly held or jointly filed return. To the extent that she files a joint return, she is in fact liable, just as Mr. Banks would be jointly and severally for the return."
Barnes testified that Mr. Banks' tax liability would be the same if Mrs. Banks provided receipts for the taxes she had paid, but that the taxes would be abated to Mrs. Banks if the returns were filed as married filing jointly.
When asked how the IRS would respond to Mr. Banks' agreement to hold Mrs. Banks harmless or indemnify her, Barnes said, "Well, you know as well as I, the IRS is not bound by any decision the parties make."
At the hearing Mrs. Banks testified as to her understanding of the disputed portion of the property settlement agreement: "My understanding of that sentence meant to me that I would provide Earle with documents on children, maybe their medicals, or any documents he need to file his return." She stated that she would not have agreed to execution of documents as part of the agreement. She said that he never asked for any tax information from her and that she never signed a joint tax return with Mr. Banks during their entire marriage. "Not only did I not sign, I have never seen joint tax returns during the whole marriage." Further, she had never known his income or been involved in any way in filing or filling out tax returns with Mr. Banks.
Mrs. Banks testified that she was notified by the IRS that she had tax problems in late February or early March, 1991. The IRS filed substituted tax returns for her for 1983 and 1984.
Mrs. Banks said that Mr. Banks approached her about signing joint tax returns on February 7 and that she told him, "Well, I need to talk to someone first." Mrs. Banks then talked to her attorney and to someone with the IRS. Her reaction to the conversation with the IRS representative was "scary" and "frightened" and affected her decision not to sign a joint return. When Mr. Banks called her, she told him that "based on talking to some experts about the situation, I had decided that it would be liable [sic] for me to sign a joint return when I have already been cleared on the years of '83, '84." According to her, Mr. Banks never mentioned any specific years for which he needed her to sign a joint tax return.
As a result of the hearing, the Special Master found that Mrs. Banks should sign the joint tax returns contingent on Mr. Banks having certified funds for the taxes owed for the years 1982 through 1986 and an indemnification agreement being executed by Mr. Banks. The Special Master found that there was no willful violation on Mrs. Banks' part and took under advisement whether she would be held in contempt.
On May 8, 1992, the Special Master considered Mr. Banks' Motion to Alter or Amend Special Master's Report and Mrs. Banks' motion to stay the proceedings. The motion to stay was denied. Mr. Banks put on proof that tax returns for 1982 through 1986 and an indemnity agreement had been sent to Mrs. Banks on March 11, 1992, along with a letter that Mr. Banks' attorney "was in receipt of a certified cashier's check for all of the amounts indicated on the returns."
Harris Barnes testified that the difference in the returns, interest and tax, would be $20,331.93. He also testified that Mr. Banks would have a failure to file penalty but that it was not figured because the IRS calculates the amount of the penalty differently than the formula he would use. Barnes also testified that the $14,817.00 in certified funds would have covered tax and interest but not the additional penalties which would be asserted.
Barnes again testified that Mrs. Banks' liability would be joint and several if she signed the returns and that the IRS would have the option of going after her for the *1120 taxes due. When asked about Mrs. Banks' exposure, Barnes testified:
Mr. Cooper's assertion of the exposure is absolutely correct, Your Honor. She would have joint and several liability for the tax, the interest and the penalties. What has happened and what happens is that when the decision order is rendered that then becomes a judgment, and it becomes a judgment and lien against both parties that are subject to the decision order. Only Mr. Banks was in court. But once Mrs. Banks filed the joint return, she then made herself joint and severally liable, not pursuant to the decision order, but through the filing of joint 1040s. The decision order, though, was primarily against Mr. Banks. And the collection procedures, in my opinion  and Mr. Cooper is right they could have proceeded against Mrs. Banks  my experience has been over the last twelve years as a tax attorney they proceed against he who has the funds, he who has the ability from whom they can be collected, and he who incurred the liability.
Barnes also testified that it was now too late to file joint tax returns.
At the hearing, Mrs. Banks raised the issue that Mr. Banks was again behind in the mortgage payments on the house.
The Special Master found Mrs. Banks in contempt for her refusal to sign the tax returns and imposed on her the obligation to pay Mr. Banks any additional penalties, taxes and interest incurred as a result of her refusal to execute joint tax returns. The Special Master directed that Mrs. Banks be incarcerated as a result of her refusal if the chancellor affirmed the ruling and Mrs. Banks continued to refuse to sign. Mrs. Banks was also to pay $300.00 in attorney's fees to Mr. Banks.
After all the chancellors in Hinds County recused themselves from the case because Mr. Banks was a practicing attorney, this Court appointed Judge George Warner, Jr. as special judge to review the report of the Special Master.
On June 24, 1992, Judge Warner affirmed the Special Master reports and recommitted the case to the Special Master to determine the following two issues:
(a) If the failure of the plaintiff to sign joint Tax Returns has caused any monetary loss or liability to the Defendant. If not, the matter will be concluded. If so, to enter a judgment in favor of the defendant against the plaintiff for said sum.
(b) If the signing of tax returns by the plaintiff will not reduce the tax liability of the defendant, then she need not sign. Otherwise, she shall sign the returns in open court before the Special Master or be immediately confined until she does so.
On July 3, 1992, Mrs. Banks filed a motion for reconsideration stating that Judge Warner had not held a hearing as required by MRCP 53(g). In the motion Mrs. Banks noted that the time for signing had passed and that the question was moot.
On September 9, 1992, Judge Warner heard testimony from Mrs. Banks that the home mortgage was in arrears $1,902.51 and that she had received a foreclosure notice. There was indication that Mr. Banks was also behind on insurance and school tuition. The hearing was concluded because of improper or inadequate notice on the motions.
On October 13, 1992, the Special Master heard testimony as to the additional tax liability Mr. Banks incurred as a result of Mrs. Banks' failure to sign.
Mr. Banks testified that he owed approximately $67,000.00 in taxes. Based on a letter from his tax attorney the previous February he would save $11,400.00 if a joint return was filed. He had not filed at the time of the hearing. Mr. Banks testified that he understood that even if Mrs. Banks signed he would still owe the $67,000.00.
Mr. Barnes testified that he and the accountants did not do a calculation of penalties and interest until just prior to the hearing. The total amount calculated as saved by filing the joint tax return for the years 1982 through 1986 was $32,323.00. The Special Master entered a report finding Mrs. Banks' responsible for $32,323.00 and assessing her with $1,619.12 in additional attorney's fees.
*1121 Judge Warner affirmed the report of the Special Master. Mr. Banks requested that Mrs. Banks' debt be offset by the child support, tuition and mortgage payments then due. Judge Warner refused to allow the debt to be offset by child support and tuition but did allow an offset of the mortgage payments until the judgment was paid. Judge Warner allowed Mrs. Banks to offset the attorney's fee owed by $1,000.00, leaving her owing $919.12.

DISCUSSION

I. WHETHER THE SPECIAL MASTER ERRED IN CONSTRUING A PROPERTY SETTLEMENT AGREEMENT ENTERED INTO BY THE PARTIES IN A DIVORCE PROCEEDING TO REQUIRE A WIFE TO SIGN JOINT TAX RETURNS WHERE THE PARTIES ONLY AGREED TO "COOPERATE WITH EACH OTHER IN THE FILING OF ALL TAX RETURNS."
In Kight v. Sheppard Bldg. Supply Inc., 537 So.2d 1355, 1358 (Miss. 1989), this Court set out the basic principles governing construction of documents:
In interpreting the writing at issue, the cardinal rule of construction is to give effect to the mutual intentions of the parties. Where, as here, the writing is ambiguous, courts are obligated to pursue the intent of the parties by resort to parol evidence. In addition, the construction which the parties have placed upon the contract, or what the parties to the contract do thereunder, is relevant extrinsic evidence, and often the best evidence, of what the contract requires them to do. Finally, the vagueness and ambiguity found in the writing at issue is construed against the party preparing it. (citations omitted).
This principle as set out in Kight has long been the standard of construction when terms of a contract are ambiguous. In Stampley v. Gilbert, 332 So.2d 61 (Miss. 1976), this Court stated:
There is also the universal rule of construction that when the terms of a contract are vague or ambiguous, they are always construed more strongly against the party preparing it. Globe Music Corp. v. Johnson, 226 Miss. 329, 84 So.2d 509 (1956); Love Petroleum Co. v. Atlantic Oil Producing Co., 169 Miss. 259, 152 So. 829 (1934).
332 So.2d at 63. This Court recently adhered to this long standing principle in Merchants Nat. Bank v. Stewart, 608 So.2d 1120 (Miss. 1992), stating:
We have construed written instruments narrowly against the drafter when there is uncertainty or ambiguity as to the intent of the parties. Clark v. Carter, 351 So.2d 1333 (Miss. 1977); Stampley v. Gilbert, 332 So.2d 61 (Miss. 1976); Miss. State, etc. v. Dixie Contractors, 375 So.2d 1202 (Miss. 1979); accord, Baton Rouge Contracting, Co. v. West Hatchie Drainage Dist., 304 F. Supp. 580 (N.D.Miss. 1969), aff'd per curiam 436 F.2d 976 (5th Cir.1971); United States v. American National Bank, 255 F.2d 504 (5th Cir.1958).
608 So.2d at 1125-1126.
In the portion of the settlement agreement at issue, there is no clear statement that the parties were to execute joint tax returns. The language from which the Special Master derived this interpretation comes at the end of a paragraph discussing the exemptions which would be allowed to the parties for the children on separate returns prepared after the divorce. Thus, the language of the settlement agreement requires resorting to parol evidence to resolve this ambiguity. As the Special Master's report indicates, this is exactly what was done.
The Special Master's Report states:
The initial issue to be addressed by the court is whether the language in paragraph XII of the Property Settlement Agreement entered into by and between the parties, obligating the parties to "... cooperate with each other in the filing of all tax returns which may now be due through the tax year 1989," includes the obligation of both parties to cooperate with each other and file "and sign" joint tax returns under the filing category of married filing jointly. The Court finds that the parties did intend and anticipated that *1122 they would be filing joint tax returns under the category of married filing jointly during the period of time that they were married, and further, that the language entered into by and between the parties in paragraph XII of the Property Settlement Agreement, requiring that the parties "... cooperate with each other in the filing of all tax returns which may now be due through the tax year 1989," included the obligation for both parties to work with each other and file and sign joint tax returns  married filing jointly.
Special Master's conclusion is supported by not only the language of the Property Settlement Agreement itself, but also by the fact that for each and every year during the course of the parties' marriage that the parties filed federal and state income tax returns; these tax returns were filed by the parties as married and filing jointly. Additionally, the evidence presented to the undersigned is undisputed that the parties, in particular Mr. Banks, would be unreasonably and unnecessarily penalized if the court were to permit Ms. Banks to refuse to cooperate with and sign the parties' tax return. Specifically, the evidence presented before the Special Master indicated that if Ms. Banks refused to execute the joint tax returns for the taxable years 1982-1986 which have been prepared in behalf of Mr. Banks as married and filing jointly; that Mr. Banks would suffer approximately $17,000-$20,000 in punitive sanctions as a result of Ms. Banks' refusal. The Court further finds that Ms. Banks has failed to present any evidence that would convince the court that it would be detrimental to her in any aspect for her to join in with Mr. Banks in the filing of joint state and federal income tax returns for the taxable years 1982-1989, particularly given the following conditions which the court imposes as a condition precedent to Ms. Banks's obligation to execute such income tax returns.
Contrary to the Special Master's finding, there was nothing in the language of the agreement which would expand the language to include "and sign" or "execute." There are other problems with the findings which are not consistent with the evidence presented to the Special Master.
Although the same tax returns were filed on behalf of the Earle and Althea Banks during earlier years of their marriage as joint returns, the undisputed testimony from Mr. Banks and Mrs. Banks was that she did not sign any tax returns. In fact, Mrs. Banks contends that she never saw any tax returns and he did not contend otherwise. Mr. Banks testified that his tax attorney, Mr. Beacham, signed tax returns for him and Mrs. Banks.
The most serious problem with the Special Master's report is the finding that both parties would be penalized if joint returns were not filed and that Mrs. Banks "failed to present any evidence that ... it would be detrimental to her in any respect for her to join in with Mr. Banks in the filing of joint state and federal income tax returns." The clear proof was that Mrs. Banks would only suffer detriment if she signed and that by signing she was exposing herself to the full extent of tax liability for which Mr. Banks had made himself liable. In short, the proof showed that she could only be harmed by signing the joint returns.
When Mrs. Banks characterizes the indemnity agreement in her brief as "claiming" to hold her harmless, Mr. Banks responded: "The Indemnity agreement did not claim to do anything  it imposed a legal duty upon Mr. Banks to hold her harmless which Ms. Banks could have enforced in a court of law." Mrs. Banks already had experience with an enforceable legal duty in that Mr. Banks was under a legal obligation to pay child support, tuition, mortgage payments and insurance, which Mrs. Banks was having extreme difficulty in getting the court to enforce. At each hearing held in this case, Mr. Banks' non-compliance was raised. His delinquency in paying the mortgage was such that Mrs. Banks was forced to get a loan in order to prevent foreclosure. Mr. Banks' track record of complying with court ordered financial responsibilities was dubious at best. Mrs. Banks was justified in her concern for protection of her interests and rights.
In addition to the indemnification agreement, the Special Master required Mr. Banks *1123 to deliver to his attorney certified funds to cover the taxes due. The testimony of Mr. Barnes clearly indicated that these funds were greatly insufficient to cover all the tax liability owed by Mr. Banks. Mr. Barnes testified that penalties and interest, which turned out to be a large part of what was owed, were not included in the calculations. Until the last hearing before the chancellor, the testimony had placed the difference in tax obligations between single filing and joint filing in the range of $10,000.00 to $20,000.00. The ultimate figure of over $32,000.00 shows how distorted the early figures actually were. The $14,000.00 held by Mr. Banks' attorney would still have been many thousands of dollars short of satisfying his tax obligation even under the most favorable tax situation. In short, Mr. Banks' failure to provide the entire amount that was owed to the IRS was not in compliance with the Special Masters' order, much less affording full protection to Mrs. Banks as required.
At the October hearing it was revealed that none of the monies delivered as a condition precedent to Mrs. Banks' signing had actually reached the IRS. While requiring that monies be delivered to cover the taxes (not including penalties and interest), the Special Master made no provision that the monies had to actually be paid to the IRS.
The whole scenario would have left Mrs. Banks with considerable potential liability and little or no real protection. During the whole of these discussions, Mr. Banks, by his own admission, was having financial problems and also was not fulfilling his obligations under the settlement agreement as to mortgage payments, tuition, child support and other money matters.
Not discussed by the lower court is Mr. Banks' own culpability in his tax problems. At no point did he, prior to being brought into tax court, make any effort to resolve his tax obligations either during the marriage or prior to February 1992. Although his original tax attorney died in 1988, there was no explanation for the further delay. Even at the time of the final hearing before Judge Warner on October 13, 1992, no tax returns had been filed for Mr. Banks even though it was long past the time when joint returns could be filed. Most significantly, no taxes had been paid, even though more than $14,000.00 had been delivered to his attorney for this purpose in late February.
Based on a fair reading of the evidence before the Special Master and comparing this with his findings, we reach the inescapable conclusion that the Special Master was manifestly wrong in construing the settlement agreement to require Mrs. Banks to sign joint tax returns.
There is a question as to the propriety of the finding of contempt. The following is taken from Smith v. Smith, 545 So.2d 725, 727 (Miss. 1989):
Civil contempt is coercive in nature. This type proceeding resembles an injunction, and is instituted by a party in order to force another party to act or cease to act in a particular manner. Jones v. Hargrove, 516 So.2d 1354, 1357 (Miss. 1987).
There are several available defenses to a civil contempt charge. One is that whatever violation there may have been of a decree or order was not willful or deliberate such that the behavior in question may not be labelled as contumacious. Dunaway v. Busbin, 498 So.2d 1218, 1222 (Miss. 1986). Included in this defense may be an honest inability to perform according to the dictates of the order or decree. Prestwood v. Hambrick, 308 So.2d 82, 85 (Miss. 1975). Another available defense is the traditional notion of "clean hands." Vockroth v. Vockroth, 200 So.2d 459, 463 (Miss. 1967). A third defense is that of an inability to obey an order which is vague or not sufficiently specific. 498 So.2d at 1222.
Mrs. Banks raised variations of all these defenses. As discussed, Mrs. Banks contends that the language of the settlement agreement did not include the obligation to sign or execute joint tax returns and that this was not her intention at the time of the agreement. She also made her decision only after consulting with her attorney and her IRS representative. She raised her right to have the report of the Special Master reviewed by the chancellor.
There are unanswered questions as to whether Mrs. Banks could comply with the report of the Special Master. At the time *1124 she was given the tax returns to sign, she had already filed separate returns herself for two of the years and been cleared of liability for the remaining years. The deadline imposed by the IRS was only days later and at that time there was no review or affirmation by the chancellor. Technically, at the time she could have signed there was no order or decree entered by the chancellor for her to disobey. Had she gone ahead and signed, any review or appeal would have been moot since she would have found herself bound by the federal tax court decree against which no state court decision would have had any effect.
A part of our consideration is the question of whether the report or decision of the Special Master has the effect of being an order prior to its ratification by the chancellor. Rule 53 of the Mississippi Rule of Civil Procedure authorizes courts to appoint masters but sets limitations on powers and duties. Nowhere in the rule is the master given the authority to order parties to perform specific duties as a result of the hearing held. Rule 53(d) sets out the master's powers:
The order of reference to the master may specify or limit his powers and direct him to report only upon particular issues or to do or perform particular acts or to receive or report evidence only and may fix the time and place for beginning and closing the hearing and for the filing of the master's report. Subject to the specifications and limitations stated in the order the master has and shall exercise the power to regulate all proceedings in every hearing before him and to do all acts and take all measures necessary or proper for the efficient performance of his duties under the order. He may require the production before him of evidence upon all matters embraced in the reference, including the production of all books, papers, vouchers, documents, and writings applicable hereto. He shall have the power to administer oaths, to take the examination of witnesses in cases pending in any court, to examine and report upon all matters referred to him, and to execute all decrees directed to him to be executed.
Masters shall have the power to direct the issuance of subpoenas for witnesses to attend before them to testify in any matter referred to them or generally in the cause. If any witness shall fail to appear, the master shall proceed by process to compel the witness to attend and give evidence.
The comment to the rule states that "masters are not supernumerary judges and should not be utilized as such... ." As set out in Massey v. Massey, 475 So.2d 802, 806 (Miss. 1985), "53(d) does not require that the order specify or limit the powers of the master, but only provides that the order `may' do so; otherwise, the powers of the master are broad."
5A, Moore's Federal Practice (2d Ed.), Ch. 53 (1994), discussing the federal version of the rule states:
As indicated by the use of the word "may" in the first sentence and by the general grant of power given by the end sentence of subdivision (c), a reference containing no limitations is a general reference to report on all the issues, both of law and fact, involved in the litigation. However, the court cannot, without the consent of the parties, refer the whole case to the master for final decision. Nor may the district court merely "rubber stamp" the master's recommendations: it must respond to the particular facts of the case and address any objections to the recommendations made by the parties.
* * * * * *
In discussing the powers of the master it should [be] made clear that although for many purposes this officer is an arm of the court, given the power necessary to control and expedite proceedings before him, the master lacks the powers of the court itself. Thus, it is the court, or the court and jury, as the case may be, and not the master, that decides all issues, and the court that renders judgment in the case. A master cannot, even with court consent, issue injunction or punish for contempt.
The report entered both verbally and as filed by the Special Master goes beyond the scope of merely reporting and goes to fashioning a final decision. The language used by the Master indicates that he believed and acted as if he had the full power of the court subject only to appellate review. Prior *1125 to this case being referred to a chancellor, the Special Master stated at the May 9, 1992 proceedings:
Of course, I ruled on March 9th that I felt like it was clear, interpreting the property settlement agreement, that you did have an obligation to cooperate with Mr. Banks, and inclusive within that was to execute joint tax returns for the taxable years at issue. I still believe that that ruling was proper and I still think you have that obligation, I am going to find that, in clarification, I believe my intent in my ruling, my bench ruling on March 9, 1992, and so as to clarify my Special Master's report, I will again rule that you were not in contempt as of March 9, 1992. I am going to find, however, that as a result of your conduct since March 9, 1992 you conduct has been willful and it has been intentional and you are in direct violation of the judgment of divorce and the settlement agreement, and I am going to find that you are in contempt of this court as of today.
Later the Master directs that Mrs. Banks be incarcerated after the chancellor's review if she refuses to execute the joint tax returns. The chancellor on June 25, 1992, entered a judgment affirming the Special Master's report without any explanation and without holding a hearing even though Mrs. Banks had requested such a hearing immediately after the first report of the Special Master.
Rule 53(g) states, in part:
Within ten days after being served with notice of the filing of the report any party may serve written objections thereto upon the other parties. Application to the court for action upon the report and upon objections thereto shall be by motion and upon notice as provided by Rule 6(d). The court after hearing may adopt the report or modify it or may reject it in whole or in any part or may receive further evidence or may recommit it with instructions.
In Kieffer v. Sears Roebuck & Co., 873 F.2d 954 (6th Cir.1989), the district court adopted the master's findings without a hearing despite plaintiff's motion for reconsideration of report. The court of appeals held that under Rule 53 the district court must hold a hearing when parties file objections to a master's report. In Vekamaf Holland B.V. v. Pipe Benders, Inc., 671 F.2d 1185 (8th Cir.1982), the court of appeals reversed and remanded a case where the district court accepted the recommendation of the master without explanation, holding that where the case involves complex issues the court must respond to the facts of the case and set forth its reasons for affirming. ("A potential risk of the magistrate's report becoming a de facto magistrate's adjudication arises unless the district court renders a thorough judicial analysis of recommendations.") Id. at 1187.
Contrary to the requirements of the rule, the chancellor in the present case did not conduct a hearing and set forth no reasons for adopting the Special Master's reports. When the chancellor finally did conduct a hearing the scope was limited.
In this case the Special Master acted beyond the scope of his authority. The chancellor appears to have totally deferred to the Special Master or "rubber stamped" his "ruling" without holding the hearing which he should have under Rule 53.
Even beyond the procedural irregularities, is the question of why this matter was referred to a special master. Given the extremely close deadline facing Mr. Banks at the initiation of this case, it should have been foreseen that this matter should have been referred directly to a chancellor. The rule clearly states that "reference to a master shall be the exception and not the rule. A reference shall be made only upon a showing that some exceptional condition requires it." The Order Appointing Special Master gives no indication why Mr. Banks requested a special master and why one was appointed given the facts of the case.
The other underdeveloped area is the question of "clean hands." At several points this equitable doctrine was invoked by Mrs. Banks, but with little consequence. At the time Mr. Banks sought to have the court enforce the property settlement agreement by having Mrs. Banks sign the tax returns, he was not in compliance with the much clearer and explicit requirements of paying the mortgage or other provisions for child support or tuition. Although he had various explanations, there was a persistent problem with Mr. Banks and his financial obligations which continued throughout the whole course of this case in the lower court.
*1126 The failure of the accusing party to come into court with "clean hands" is one of several defenses to a civil contempt action. Cooley v. Cooley, 574 So.2d 694, 698 (Miss. 1991); Smith v. Smith, 545 So.2d 725, 727 (Miss. 1989). On the doctrine of clean hands, Griffith, Mississippi Chancery Practice § 42 (1950) states: "It is the meaning and purpose of this maxim to declare that no person as a complaining party can have the aid of a court of equity when his conduct with respect to the transaction in question has been characterized by wilful inequity, or illegality... . It may be described as such wilful misconduct, inequity or fraud with respect to the immediate transaction as would be condemned and pronounced wrongful by honest and fair-minded men."
As between the parties, it cannot be said that Mr. Banks came into court with entirely "clean hands." While seeking the aid of the court in enforcing language in the settlement agreement which at best was less than clear, he was persistently delinquent as to his own specific obligations under the agreement. While his behavior was not necessarily wilful and deliberate such that a finding of contempt would have been appropriate, his behavior was persistently inconsistent with one seeking equitable aid from the court.
The Special Master was in error in construing the property agreement to include an obligation to sign joint tax returns under the facts of this case and in finding Mrs. Banks in contempt.

II. WHETHER THE SPECIAL MASTER ERRED IN IMPOSING A JUDGMENT AGAINST MRS. BANKS FOR TAX LIABILITY BASED UPON THE DIFFERENCE BETWEEN WHAT MR. BANKS WOULD HAVE OWED HAD HE FILED A JOINT RETURN WITH MRS. BANKS INSTEAD OF A MARRIED FILING SEPARATELY RETURN, WHERE SHE NEVER HAD AN OPPORTUNITY TO BE A PARTY TO THE TAX COURT PROCEEDINGS ASSESSING MR. BANKS' TAX LIABILITY.
Mrs. Banks points out that the lower court penalized her for refusing to become a party to a federal tax court proceeding where liability had already been assessed without her having any opportunity to participate. As previously noted, her signature would make her fully and equally liable for the entire tax liability.
At the time of their divorce and the drafting of the property settlement agreement, Mr. Banks was fully aware that he would have to file tax returns for the years 1982 and following. Mr. Banks received statutory notices of deficiency during the early part of 1991. Petitions to contest were filed in approximately May 1991, and the case docketed for trial February 10, 1992. This was a civil fraud case which "in essence doubles the tax, interest and penalties." Rather than go to trial, the case was settled. Three to three-and-a-half days were spent reviewing records with representatives of the IRS. The decision of the Tax Court filed on February 11, 1992, was "[p]ursuant to the agreement of the parties... ." It is undisputed that the first time Mr. Banks contacted Mrs. Banks was not until "3:15 in the afternoon" on February 7, 1992 after he had concluded his agreement with the IRS. There is no indication that Mr. Banks' attorney or accountant had sought to contact her prior to this time.
At the time Mr. Banks first sought out Mrs. Banks "to cooperate", he and his attorney had been involved with the IRS for over a year and had not yet contacted her. Mr. Banks filed his Motion to find Respondent in Contempt and for Affirmative Relief on February 26, 1992, nineteen (19) days after he first talked to Mrs. Banks and asked her to sign the joint returns.
At the time the Special Master first considered this case, there was less than one week remaining of the thirty day period the Tax Court had given Mr. Banks to secure Mrs. Banks' signature on the tax returns. The actual tax forms were sent to Mrs. Banks on March 11, 1992, which was two days before the March 13 deadline. Along with the forms was a copy of the indemnity agreement signed by Mr. Banks. The Special Master's report (filed March 17, 1992) included the following:

*1127 Additionally, the court finds that each parties' obligation to cooperate with each other in the filing of all tax returns as set out in the Property Settlement Agreement, also includes the obligation to exchange documents as may be reasonable and necessary to permit both parties to have access to the necessary financial records in order to prepare and review any joint tax returns [sic].
At the March 9, 1992 hearing the Special Master, as part of his findings, stated:
To the extent that either party has documents that it is necessary for the other party to utilize, whether it be receipts or financial records, or whatever, then that party with possession of the documents shall deliver to the party that needs those documents whatever necessary documents. This is a two-way street. Mr. Banks, I've heard a lot about the fact that Mrs. Banks has some documents that you need in order to prepare your tax return. She is also entitled to know what's going on. She's entitled to review tax returns. She is entitled to review backup information and have a tax accountant or tax preparer, or whatever, also review that information as well.
As it developed, Mr. Banks did not need any documents from Mrs. Banks. The exchange of documents never happened. There is no indication that Mrs. Banks was ever given or offered the "backup information" in support of the tax returns. This is consistent with Mr. Banks' previous dealings with Mrs. Banks during the marriage. Mr. Banks handled all the filing of income taxes during the marriage. He alone had access to most of the supporting documents and records. Mrs. Banks did not even know what his income was during their entire marriage.
Mr. Banks calls her protestations that she was not a party to the proceeding "mere cynical sophistry, fashioned to extricate Ms. Banks from a quandary she herself created." This suggests that Mrs. Banks was responsible for causing this tax problem, rather than Mr. Banks. In fact, Mr. Banks seems to have been unwilling to accept any responsibility for his own failure to file income tax returns.
Of the $64,740.00 that would be owed by Mr. Banks by filing married filing separately, only $22,125.00 is taxes. The remaining $42,615.00 is for failure to file, failure to pay, negligence, interest and interest penalty. The testimony of Mr. Barnes suggests that many of these fees could have been avoided if Mr. Banks had not let the matter get to Tax Court. This neglectful pattern in handling financial matters during their marriage and the succeeding years shortly thereafter certainly gives credence to Mrs. Banks' concerns and alarm about her liability and exposure under this issue.
It should be noted that the amount assessed against Mrs. Banks by the Special Master is roughly half the entire tax liability due. Also, the total taxes and other fees due if filing jointly totalled $33,653.00, which is considerably more than the $14,000.00 which Mr. Banks tendered to his attorneys as payment under directive from the Special Master. The Special Master's conclusion that Mr. Banks fulfilled his conditions to Mrs. Banks signing is not supported by the proof.
Contrary to the findings and the testimony, the actual difference between filing jointly and filing singly was $31,087.00 according to the document used by Mr. Banks in testifying. Mr. Banks failed to give Mrs. Banks the benefit of the $1,236.00 which would be owed for 1983 if filing singly.
On the whole, this case resulted in Mrs. Banks being made to suffer rather severe consequences, despite there being clear merit to her argument and concerns.
In the present case, Mr. Banks did little or nothing to minimize his loss after it was clear that Mrs. Banks would not sign. In Pelican Trucking Co. v. Rossetti, 251 Miss. 37, 43, 167 So.2d 924, 927 (1964), this Court said, "One suing for damages is required to minimize his loss." See Jones v. Benton County Board of Education, 389 So.2d 1381, 1383 (Miss. 1980); Bridges v. Land, 252 So.2d 209, 211 (Miss. 1971). At the time of the last hearing Mr. Banks had not filed returns or made any payments or made any effort to stop the running of the additional interest and penalties which are tied to time of filing and remaining taxes owed. It *1128 seems contrary to established principles of recovery to allow the meter to continue to run and then be able to charge this to the opposing party. Yet, that is precisely what was done. The Special Master had already ruled that Mrs. Banks would be responsible for the additional taxes and interest, and Mr. Banks did nothing to minimize these damages even though he was in a position to do so. Any additional damages which occurred after March 13, 1992, the deadline set by the Tax Court for Mrs. Banks' signature, should not have been charged against her even if she were liable under the agreement of the parties. The figures used by the Special Master in assessing damages had interest figured through October, some seven months beyond the point where Mr. Banks should have filed and made payment of the monies tendered to his attorneys. Mr. Banks and his attorneys were fully aware that he would be filing "married filing separately" at that point.
The Special Master clearly erred in finding that Mrs. Banks should be liable for the additional taxes and the chancellor was in error in affirming the Special Master.

CONCLUSION
Considering all the testimony presented to the Special Master, his findings cannot be supported or justified. Although joint tax returns had been filed for the Banks' in years prior to those under discussion, Mrs. Banks never signed them herself nor was she ever involved in the preparation. The Special Master erred in finding that the property settlement agreement requiring the parties "to cooperate with each other in the filing of all tax returns which may now be due through the tax year 1989" included "and sign" based on an intent on the part of Mrs. Banks to sign joint tax returns. The undisputed testimony from both Earle and Althea Banks was that Mr. Banks had prepared joint tax returns during their marriage without Mrs. Banks having ever seen or signed any returns. Mrs. Banks testified that she did not intend to file joint returns and had already settled her tax liability for the same period.
The report's conclusion that it would not be detrimental to Mrs. Banks to sign the joint returns was directly contradicted by testimony that Mrs. Banks would be jointly and severally liable for all taxes, interest and penalties on the returns and that the indemnification agreement would not be accepted by the IRS.
Mr. Banks never sought to include Mrs. Banks in any of his dealings with the IRS or Tax Court. He only sought to involve her after it had been determined that he would have a substantial tax savings if she signed. When he sent the tax returns to Mrs. Banks there was no supporting documentation, contrary to the Special Master's instructions. The amount tendered to Mr. Banks' attorneys for payment of the taxes was not nearly adequate to cover all the then due taxes and penalties. During the whole course of this case, Mr. Banks was experiencing financial problems and was derelict in his responsibilities of child support, tuition and mortgage payments which were part of the settlement agreement.
The shifting of roughly half of Mr. Banks' tax burden to Mrs. Banks cannot be justified. Most of the tax liability was the result of Mr. Banks' own delay and neglect. The lost opportunity to file joint returns was also due in part to Mr. Banks' delay; Mrs. Banks was within her rights in seeking review by the chancellor of the Special Master's report before signing. Even after it was clear that Mrs. Banks would not sign in time, Mr. Banks made no attempt to mitigate damages.
This entire proceeding raises substantial questions as to the roles which should have been taken by the Special Master and the chancellor in this particular case.
This Court finds the special master and the chancellor erred.
REVERSED AND RENDERED.
HAWKINS, C.J., PRATHER, P.J., and SULLIVAN, PITTMAN and JAMES L. ROBERTS, Jr., JJ., concur.
McRAE, J., dissents with separate written opinion joined by DAN M. LEE, P.J.
BANKS, J., not participating.
*1129 McRAE, Justice, dissenting:
Having once again acted as Super Chancellor, the majority made its own conclusions from the record. Absent manifest error, this Court cannot overturn a chancellor. Because the majority totally disregarded the fact-finders below, I dissent.
The majority's author chastises the special master and chancellor for looking only to the property agreement. However, the property agreement for divorce was included in the judgment of the court, and therefore, this Court should be focusing on the previous judgment and not what the majority terms as the "contract" between the parties. In actuality, the contract merged into the judgment and the special master and chancellor interpreted this to mean Mrs. Banks was required to execute the tax returns, contrary to the majority's determination.
Mrs. Banks in fact relied or acquiesced in her husband's filing tax returns during their marriage, including the signing of her name. But when it came down to the wire, she claimed she did not agree to incur tax liability when it was determined that her husband owed a large sum of money to the IRS. Mr. Banks complied with the master's order by tendering $14,817, the amount owed as originally indicated by the returns. Mrs. Banks did not comply with her end of the bargain by signing the joint returns.
The majority makes a fuss over the ambiguity of the Banks' agreement with each other by stating that the special master should have resorted to parol evidence to determine whether they meant for Mrs. Banks to sign joint tax returns. In addition, the majority states that Mr. Banks was the party drafting the "contract" and, therefore, it should be construed against him. This analysis misses the boat because, if anything, it was an agreement entered into by both parties seeking a divorce and certainly not the one-sided deal the majority portrays. The agreement is not a contract which needs interpretation, but rather, was adopted by the lower court and made a part of its judgment.
Mr. Banks testified that he understood the language in the agreement to connote that Mrs. Banks would sign the returns with him. Mrs. Banks testified that she understood the language meant she would provide whatever documents he needed regarding the children in filing such returns. The majority states that since the document was prepared by Mr. Banks' attorney, on evenly matched testimony, the document should be construed in favor of Mrs. Banks. Observation of the witnesses in making decisions is the whole purpose of the master and the chancellor, a luxury this Court did not have when it rewrote the results of the judgment.
Moreover, the majority identifies Mrs. Banks' actions as not viewing the agreement in the same way as Mr. Banks, but fails to recognize that she was found to be in contempt of a court order for failure to obey its directive. An ambiguity analysis is, therefore, not only unnecessary, but incorrect.
I do not agree with the majority substituting its judgment in the place of the chancellor and special master, particularly reversing and rendering the judgment. I would affirm the chancellor where there is not manifest error which is what our rules require us to do.
DAN M. LEE, P.J., joins this opinion.