# IN THE COURT OF APPEALS
## OF THE
## STATE OF MISSISSIPPI
### NO. 96-CA-00466 COA

**A. LEWIS FREEMAN**                                                    **APPELLANT**

**v.**

**GREENVILLE CONVALESCENT HOME, INC.**                                  **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 03/21/96 |
| TRIAL JUDGE: | HON. BETTY W. SANDERS |
| COURT FROM WHICH APPEALED: | WASHINGTON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | L. CARL HAGWOOD |
| | R. BRITTAIN VIRDEN |
| ATTORNEY FOR APPELLEE: | PATRICK F. MCALLISTER |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| TRIAL COURT DISPOSITION: | SUMMARY JUDGMENT FOR GREENVILLE CONVALESCENT HOME, INC. |
| DISPOSITION: | REVERSED AND REMANDED - 12/18/1998 |
| MOTION FOR REHEARING FILED: | 12/30/98 |
| CERTIORARI FILED: | 3/8/99 |
| MANDATE ISSUED: | |

EN BANC

SOUTHWICK, J., FOR THE COURT

¶1. Summary judgment was granted to an employer in a dispute over an employee's contractual right to continued employment. The discharged employee appeals arguing various issues. We agree with one of them: a dispute of material fact remains as to whether there was a definite length to the term of employment. We therefore reverse and remand.

## FACTS

¶2. George Edwards and Bill Holloway as equal shareholders formed Greenville Convalescent Home, Inc. (GCH) in 1969. Shortly after the nursing home opened, Edwards was killed in an automobile accident. His

wife, Doris Edwards, inherited Edwards' half-ownership. She remarried and is now known as Doris Edwards Bariola Jones (Mrs. Jones). Edwards' nephew, A. Lewis Freeman, worked at the nursing home since it opened. On February 1, 1970, Freeman became administrator of the nursing home. He continued in that position until August 22, 1994, when Mrs. Jones as President of GCH terminated him. This litigation resulted.

¶3. The agreements between Freeman and GCH through the years are central to determining what rights Freeman may have beyond being an employee-at-will, terminable for any reason. The first agreement was a deferred compensation agreement signed on October 21, 1977. GCH promised to pay Freeman the sum of $1,000 per month for a total of 120 months beginning the month after Freeman's sixty-fifth birthday. That date was to be regarded as Freeman's "normal retirement date." The agreement recited that GCH desired to retain Freeman in an executive capacity and was "fully aware that it would suffer financial loss" should he go to a competitor. The agreement also contained the following two paragraphs:

> For his services, while so employed, the Employer agrees to pay the Employee (in addition to his current annual compensation) deferred compensation after his retirement or death, in such amounts and subject to such conditions as are hereinafter set forth.
>
> . . . .

7. Nothing in this Agreement shall obligate the Employer to retain the Employee in its employment, or the Employee to remain in the Employer's employment, in any capacity, for any period.

¶4. On April 5, 1985, GCH and Freeman executed an amendment to this agreement. Freeman's deferred compensation was increased from $1,000 to $1,500 per month and a description of the method of funding was made. Freeman alleges that on September 15, 1986, he and GCH executed another amendment. It was handwritten and only stated this:

> Paragraph 7 of this agreement is hereby [amended] to read as follows[:]
>
> The Employee shall remain in the employer's employment for any period up to age 65.

¶5. On September 11, 1981, which was after the execution of the original deferred compensation agreement but before any amendments, Freeman signed an instrument entitled simply "Contract." This described GCH's desire to continue Freeman as an employee and provided what the contract called "assured rewards and incentives" to keep him employed, including obligating GCH's owners to give Freeman 20% of the proceeds of any sale of the company. One of the two original owners, Bill Holloway, entered into a stock redemption agreement in 1983 with GCH. Since this buy-out might have required Freeman to be paid 20% of the proceeds, an agreement was signed by Freeman, by the remaining owner, Mrs. Jones, and by GCH to continue the previous agreements even though Holloway would no longer be a party. Freeman asserts that in return for relinquishing a claim to any part of the sale proceeds an oral promise was made to retain him until age 65.

¶6. There are two other documents that GCH uses to argue that Freeman had no contractual rights. An employee handbook adopted sometime after Freeman began working as the administrator stated that all employees could be terminated without notice and that nothing in the handbook created contractual rights. In addition, on October 30, 1990, Freeman signed an acknowledgment that he had read a description of his

duties. Among the recitals was that he understood that his employment was at-will and could be terminated without notice.

¶7. GCH argues that the reason for Freeman's termination was reports issued by the Mississippi Department of Health (MDH) for the years 1991, 1992, and 1994. The nursing home received Level A and Level B deficiency citations. While the nursing home received no Level A citations for 1993, it did receive various Level B deficiencies for that year. Under the MDH's regulations, Level A citations result in a temporary ban on admissions to the nursing home. Allegedly because of MDH's citations, Mrs. Jones wrote Freeman a letter of termination dated August 23, 1994. She explained that "the quality of the Home has significantly deteriorated . . . and an immediate change of administrator was essential" to GCH's future success.

¶8. This litigation was initiated by GCH when it filed for declaratory judgment in the Washington County Chancery Court. Freeman successfully moved to have the case transferred to circuit court. The transfer occurred October 23, 1995. GCH wanted a declaration of Freeman's rights to deferred compensation under the various agreements. Since Freeman no longer received compensation, GCH alleged that he also was not entitled to have GCH make premium payments on insurance policies purchased under the Deferred Compensation Agreement. Freeman counterclaimed that his termination violated his contractual rights. He sought compensatory damages, including the loss of his salary in the amount of $1,207,476, and punitive damages.

¶9. After discovery, GCH moved for summary judgment on Freeman's counterclaim. GCH argued that Freeman was an employee at will and that Freeman's contractual right to 20% of any future sale proceeds was void because of the rule against perpetuities. Freeman responded only with a denial or an admission of each paragraph in the motion and with a narrative interpretation of the various instruments on which GCH relied. On March 21, 1996, the date of the order by which the circuit judge granted summary judgment to GCH, Freeman filed an affidavit to which he raised for the first time the 1986 handwritten amendment to the deferred compensation plan. In his affidavit, Freeman explained that in 1983 when Holloway sold his interest, Freeman was orally promised employment until age 65 as consideration of his relinquishing a claim for 20% of the proceeds of the sale of Holloway's interest. The handwritten 1986 document allegedly was the tardy recognition of this oral 1983 promise.

¶10. The circuit court found that Freeman was an employee at will and could be terminated. However, the court rejected GCH's rule against perpetuities argument, saying that the rules did not apply to business interests. Freeman remained entitled to future proceeds of any sale, but no breach of the September 11, 1981 contract and its September 1, 1983 amendment had occurred since Freeman's rights applied only if the business was leased or sold.

¶11. An order was entered April 16, 1996, reconsidering the previous judgment. Addressed for the first time was the handwritten second amendment, the authenticity of which was challenged by GCH. Without deciding authenticity, the court found that the amendment could not be an employment contract because the length of employment and salary were not stated. Thus Freeman remained just an at-will employee and could properly be terminated. It is from that order that Freeman appealed to the supreme court and his suit was then deflected here.

## DISCUSSION

¶12. The legal foundation upon which both parties' arguments have to build is that employment in Mississippi is "at-will," meaning that the employee has neither the right to be retained nor the obligation to remain. Either side's termination of the relationship requires no justification. This general rule is superceded when there is an agreement that creates obligations or when some public policy reason intervenes. *McArn v. Allied Bruce-Terminix Co., Inc.*, 626 So. 2d 603, 607 (Miss. 1993). Freeman argues that the above-described agreements required his retention.

¶13. Freeman asserts that the lower court erred in granting summary judgment because disputes of material fact remained. Motions for such judgments serve the worthwhile purpose of focusing the parties and the court on whether there are disputes of relevant fact that need to be tried, or only disputes of relevant law for which there need be no trial. M.R.C.P. 56. Our review reconsiders the question of whether the material facts are undisputed and applies our own interpretation of the law. *Daniels v. GNB Inc.*, 629 So. 2d 595, 599 (Miss. 1993).

## 1. Freeman's contractual rights

¶14. One of the facts that Freeman finds in dispute is whether there was an oral contract requiring continuing employment. Freeman does not appear to argue, nor could he legitimately do so, that if all that existed here was an oral contract that it would be enforceable. Under our statute of frauds, a contract that will extend for longer than fifteen months must be in writing. Miss. Code Ann. § 15-3-1 (d) (Rev. 1995). It is alleged that various written documents memorialized the agreement in its basic details. If so, then that would remove the statute of frauds problem. This factual argument, though, raises the question that pervades the entire case -- does anything in writing give Freeman a contractual right to continue in his employment?

¶15. One of the authorities discussed by each party addressed what was necessary to prove an enforceable oral contract of employment that because it was for a term less than fifteen months, was not subject to the statute of frauds. *Short v. Columbus Rubber and Gasket Co.*, 535 So. 2d 61, 64 (Miss. 1988). An oral employment contract must at least have settled on the length of the employment and the salary. *Id.* Of course, if the agreed term was for more than fifteen months, the contract would violate the statute of frauds. Though the case makes some general observations about enforceable written employment contracts, we look elsewhere for direct authority.

¶16. There is no question in this case that an employment contract was formed. We have already described the various documents, including the 1977 deferred compensation agreement and the 1981 contract, both of which are agreements establishing terms to Freeman's employment. Our issue is not whether there was an employment contract -- in this case there are almost too many such agreements. Freeman without a doubt was an employee who had a contract. We must decide if one of the terms of the contract created employment security. *See* Henry H. Perritt, Jr., Employee Dismissal Law and Practice, §§ 4.32 & 4.42 (3rd ed. 1992). If there was not such a provision in the overall agreements, then Freeman could be terminated at will.

¶17. What Freeman must prove is the existence of a contract term for continued employment, free from invalidity under the statute of frauds or other rules, that has been breached. To be breached, the term must be sufficiently definite to create enforceable obligations. The trial court and GCH here assert that any employment security provision must be definite both as to economic benefits and temporal length. We will examine the agreements to determine whether such terms exist.

¶18. The 1977 agreement provided that GCH would pay deferred compensation to Freeman "in addition to his current annual salary" for his services while employed. Thus the economic benefits of the agreements were established -- a specific and later modified deferred compensation *and* his then-current annual salary so long as he was employed. That salary may have changed through the years, and the 1977 agreements would not reasonably prevent such increases.

¶19. As to length of employment, the initial contract of employment, which was the deferred compensation agreement dated October 21, 1977, specifically provided that there was no obligation on the part of either party to continue the contract. On April 5, 1985, certain changes were made that did not affect the obligation to continue Freeman in his employment.

¶20. What finally creates a possibility of a definite term of employment was the disputed amendment of September 15, 1986. It changed only paragraph 7 of the original agreement. Original paragraph 7 stated that "[n]othing in this Agreement shall obligate the Employer to retain the Employee in its employment, or the Employee to remain in the Employer's employment, in any capacity, for any period." The 1986 document, allegedly signed both by Freeman and by Greenville, said this: "7. The Employee shall remain in the Employer's employment for any period up to age 65."

¶21. The only change made in 1986 was the one just quoted. According to GCH, even if the document is authentic the one change that it made was no change at all. The phrase "any period" is said to prevent the provision from having sufficient definiteness to be given effect. After the 1986 amendment, the parties were just where they were before the amendment.

¶22. Our interpretation starts differently. First, words of contracts are to be given meaning wherever possible. No construction should be adopted "if it can be reasonably avoided, which will charge the parties with having bound themselves to provisions which are . . . senseless, ineffective, meaningless or incapable of being carried out. . . . " *Wilson Industries, Inc. v. Newton County Bank*, 245 So. 2d 27, 30 (Miss. 1971) . An amendment to a contract presumably amended something. A court must "give effect to all provisions" if possible. *Glantz Contracting Co. v. General Electric Co.,* 379 So. 2d 912, 917 (Miss. 1980). In other words, all clauses in the document as a whole must be considered in determining meaning. *Holloman v. Holloman,* 691 So. 2d 897, 899 (Miss. 1996).

¶23. Finally, a contract that is ambiguous can be clarified by testimony and other evidence. Divining the intent of the parties is the first rule of contract construction. *Smith v. Smith*, 656 So. 2d 1143, 1147 (Miss. 1995). Ambiguity does not void an agreement if other evidence sufficiently and reliably explains what an ambiguous term means:

> If, however, a careful reading of the instrument reveals [the parties' intent] to be less than clear, definite, explicit, harmonious in all its provisions, and free from ambiguity throughout, the court is obligated to pursue the intent of the parties, and, to determine the intent, must resort to extrinsic aid.

*Century 21 Deep South Properties v. Keys,* 652 So. 2d 707. 716-17 (Miss. 1995), (quoting *Barnett v. Getty Oil Co.,* 266 So. 2d 581, 586 (Miss. 1972)).

¶24. Development of the facts surrounding the September 1986 document, including whether it can be authenticated, may well confirm the presumption that its purpose was to amend something about paragraph 7. The language chosen could be interpreted to mean that the parties agreed that Freeman could stay

employed until age 65 if he wanted to do so, i.e., he could not be fired but neither would he be responsible in damages if he resigned. Original paragraph 7 discussed the term of employment from both the employer's and the employee's perspective. The amendment may have been reacting to that dual discussion. Such a provision would be enforceable, as it has a definite term.

¶25. Freeman believes that the provision unambiguously guaranteed employment until age 65. Greenville argues it unambiguously guaranteed nothing at all. Our view is that the amendment is ambiguous, both as a result of examining the 1986 document by itself and also by seeing it in context of being an amendment to an agreement that provided no definite term of employment. A court is obligated to determine what a contract provision means and to enforce it if the provision is valid. *Banks v. Banks,* 648 So. 2d 1116, 1121 (Miss. 1994). We find both that the amendment must have had meaning, but the circumstances and parole evidence must be resorted to because of the ambiguity of the language used.

¶26. Finally we turn to whether any other agreements removed the possible effect of the 1986 amendment. The employee handbook is one such possibility, as it provides that employees serve at-will. However, the handbook also refers to the possibility of written employment contracts being entered with individual employees. The general handbook language regarding at-will employment would appear to be limited to employees without specific contracts that override that language.

¶27. Another possibility is the 1990 job description that Freeman signed. It is a detailed document setting out over five and a half pages the administrator's responsibilities. Immediately above the signature block on the last page, the document states that "I understand that my employment is at-will, and thereby understand that my employment may be terminated at-will by the facility or myself with or without notice."

¶28. The trial court did not rely upon this provision. Facially it is a description of duties and not a bargained-for contract involving an offer and acceptance. If Freeman had acquired at least by September 1986 a right to employment security, there is no stated consideration in 1990 for his relinquishing that security merely to have imposed a detailed job description. On this record, we find no basis to hold that a sentence included within the 1990 job description would have abolished rights created by the earlier agreements.

¶29. We reverse and remand for further proceedings. We are not finding that the September 1986 amendment created employment security. The amendment is ambiguous. Instead, we hold that Freeman may move beyond summary judgment to attempt to prove what that amendment meant. GCH certainly may counter with its own evidence, including whatever conditions are to be implied even if a contract does grant a term of employment.

## 2. Rule against Perpetuities

¶30. GCH argues on cross-appeal that the deferred compensation agreement violated the rule against perpetuities. The trial court disagreed, finding that this common law doctrine has no application to business interests.

¶31. We start with a definition: "[n]o interest is good unless it must vest, if at all, no later than twenty-one years after some life in being at the creation of the interest." *Matter of Estate of Anderson v. Deposit Guar. Nat'l Bank*, 541 So. 2d 423, 428 n. 8 (Miss. 1989) (citing J. Gray, *The Rule Against Perpetuities,* § 201 at 191 (4th ed. 1942)).

¶32. The argument is that Freeman's rights to 20% of the proceeds from the sale or lease of the business is

right that is transferrable and inheritable, and thus may outlast any life in being and the additional twenty-one years of the perpetuities period. For its argument, GCH cites *Pace v. Culpepper*, 347 So. 2d 1313, 1317 (Miss. 1977). In that case, the Walkers conveyed by warranty deed approximately two acres of property to the Culpeppers and granted them the first option to purchase an additional fraction of an acre "if and when" the Walkers desired to sell the property outside of the family. *Id.* at 1314-15. In considering whether the option violated the rule against perpetuities, the supreme court focused on the type of provision in the deed. If the provision was a personal covenant between the Walkers and the Culpeppers, it would extinguish upon their death and thus not violate the rule against perpetuities. However, the court held that the preemptive right was not personal because the option granted the individuals and "their heirs, executors, administrators, and/or assigns the first option to purchase" the property. *Id.* at 1316. The court concluded that the option violated the rule against perpetuities because "there [was] a possibility that it may not become vested within the time required by the rule." *Id.* at 1318. Consequently, the court canceled the option to purchase the additional property. *Id.*

¶33. The supreme court has adopted an ameliorative doctrine labeled the "wait-and-see" approach. Only if the contingent future interest *in fact* fails to vest within the period of the rule will it be void. If it vests within the period, it will be valid. *See Phelps v. Shropshire*, 254 Miss. 777, 785, 183 So. 2d 158, 163 (Miss. 1966). Since *Phelps* the court has continued to consider what actually happens rather than what might happen following the creation of a contingent interest. *Matter of Estate of Anderson v. Deposit Guar. Nat'l Bank*, 541 So. 2d 423, 433-34 (Miss. 1989); *C & D Inv. Co. v. Gulf Transp. Co.*, 526 So. 2d 526, 529-30 (Miss. 1988).

¶34. Under the wait-and-see doctrine, since Freeman is still alive his right to receive 20% of proceeds would not yet violate the rule against perpetuities.

¶35. More general arguments made by Freeman, and adopted by the trial court, that the rule against perpetuities is inapplicable to interests of this kind raise questions of first impression in Mississippi that are unnecessary to resolve because of the wait-and-see doctrine.

¶36. **THE JUDGMENT OF THE CIRCUIT COURT OF WASHINGTON COUNTY IS REVERSED AND THE CAUSE IS REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.**

**BRIDGES, C.J., McMILLIN AND THOMAS, P.JJ., COLEMAN, DIAZ, HERRING, HINKEBEIN, KING, AND PAYNE, JJ., CONCUR.**