# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2006-CA-00826-SCT

*AMSOUTH BANK*

*v.*

*CHARLES QUIMBY*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/10/2006 |
| TRIAL JUDGE: | HON. ROBERT G. EVANS |
| COURT FROM WHICH APPEALED: | SMITH COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | E. BARNEY ROBINSON, III |
| ATTORNEYS FOR APPELLEE: | STANLEY A. SOREY |
| | EUGENE C. TULLOS |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 09/06/2007 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, P.J., EASLEY AND GRAVES, JJ.**

**WALLER, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     Charles Quimby filed a complaint in the Circuit Court of Smith County against AmSouth Bank and American Heritage Life Insurance Company alleging that their failure to pay benefits under a credit disability insurance policy constituted a tortious breach of contract and caused him emotional distress. Both defendants filed answers, and AmSouth filed a motion to compel arbitration. The circuit court denied the motion to compel arbitration, and from its amended order, AmSouth now appeals.[1] Under the rule announced

---

[1]American Heritage filed a motion for summary judgment prior to the hearing on the motion to compel arbitration and so remains a defendant below. It has not joined in this

in *Tupelo Auto Sales, Ltd. v. Scott*, 844 So. 2d 1167 (Miss. 2003), this court has jurisdiction over this appeal.

**FACTS**

¶2.    In 1985, Charles Quimby opened a line of credit with Deposit Guaranty National Bank. Deposit Guaranty is a predecessor to AmSouth Bank, having merged with AmSouth on December 31, 1999.[2] There is no signature card for the line of credit account in the record nor is there an original contract in the record covering this account. In his complaint, Quimby alleges that at the time he opened the line of credit, he requested credit disability insurance. On February 9, 2000, AmSouth mailed a Customer Agreement to each Mississippi resident with an open account. The agreement covered 'the use of any type of depository account you have with us, both personal and nonpersonal, except for time deposits, certificates of deposit, and IRAs.' It contained new terms for these accounts, notably including an arbitration clause.

¶3.    According to his complaint, Quimby became disabled on June 15, 2000. He demanded benefits from American Heritage, which denied he is covered under any credit disability policy. Having been denied what he thought was due, Quimby filed suit in 2005 to recover the benefits plus compensatory damages for emotional distress and punitive damages for tortious breach of contract. AmSouth answered, raising arbitration as a defense, and subsequently filed a motion to compel arbitration.

---

appeal.

[2]Quimby had previously opened two separate checking accounts in 1981 and 1982 with First National Bank of Laurel, and a savings account in 1984 with Deposit Guaranty. First National Bank of Laurel also merged with AmSouth prior to December 1999.

2

¶4.	After a hearing on the motion, the circuit court sent a letter to counsel explaining it would deny the motion and the basis of its ruling:

> From the pleadings, briefs, exhibits, and authorities filed in connection with the above encaptioned matter, the following is clear:
>
> 1.	The "Amendment to Customer Agreement" was effective March 17, 2000;
> 2.	The plaintiff (according to his complaint) became disabled in June of 2000; and
> 3.	The arbitration clause became effective March 1, 2004.
>
> It is my opinion that since the plaintiff's cause of action accrued almost four (4) years prior to the effective date of the arbitration agreement, the bank's motion to compel arbitration and stay proceedings should be denied. It is also my opinion that this case is controlled by *B. C. Rogers Poultry, et al v. Wedgeworth*, 2005 WL 2234777 (Miss ).
>
> I do not believe that the bank can rely on the March 17, 2000 "Amendment of Customer Agreement" because while said document does say the bank can change the customer agreement at any time, it does not say that future changes would relate back to March 17, 2000. Again, I think this is squarely in line with the ruling in the *Rogers v. Wedgeworth* case, despite Judge Lee's 2001 opinion in *Beneficial National Bank, et al v. Payton*, 214 F. 2d 679.

After AmSouth filed a supplemental motion to compel arbitration, the circuit court wrote another letter to counsel which provided in relevant part:

> I read and considered Mr. Robinson's October 19 letter and supplemental motion, together with the "intervening evidence," the "Second Affidavit of Kimberly Burkhalter." I compared this affidavit with Ms. Burkhalter's first one paragraph-by-paragraph and found the changes of little or no import. I found nothing to change the dates I felt controlling in my October 18 letter. Further, other than reading *Rogers v. Wedgeworth* different from me, the supplemented amended motion to compel arbitration simply appears to rehash matters I have already decided.

3

In its Amended Order Denying Motion to Compel Arbitration, the court incorporated these letters as the rationale for its ruling. The amended order itself includes no other grounds for denying the motion to compel arbitration. AmSouth appealed.

## STANDARD OF REVIEW

¶5.    An order denying a motion to compel arbitration raises a question of law and is subject to de novo review. *Smith v. Captain D's, LLC*, ___ So. 2d ___, 2006-CA-00024-SCT, ¶ 9 (June 14, 2007); *East Ford, Inc. v. Taylor*, 826 So. 2d 709, 713 (Miss. 2002). At this stage, this court's review is limited to a two-pronged inquiry: "The first prong has two considerations: (1) whether there is a valid arbitration agreement and (2) whether the parties' dispute is within the scope of the arbitration agreement. . . . Under the second prong, the United States Supreme Court has stated the question is 'whether legal constraints external to the parties' agreement foreclosed arbitration of those claims.'" *East Ford, Inc.*, 826 So. 2d at 713 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626, 105 S. Ct. 3346, 87 L. Ed. 2d 444 (1985)). Under the second prong, applicable contract defenses available under state contract law such as fraud, duress, and unconscionability may be asserted to invalidate the arbitration agreement without offending the Federal Arbitration Act. *Id.* (citing *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 686, 116 S. Ct. 1652, 134 L. Ed. 2d 902 (1996)). We find that Quimby's claims do not fall within the scope of a valid arbitration clause in AmSouth's Customer Agreements, and hold that the circuit court's judgment is correct and is hereby affirmed.

## DISCUSSION

4

¶6.    The circuit court's judgment denying the motion to compel arbitration rests primarily upon this court's opinion in ***B.C. Rogers Poultry, Inc. v. Wedgeworth***, 911 So. 2d 483 (Miss. 2005).  AmSouth devotes half of its brief to arguing that the circuit court misapplied its holding, reaching an incorrect result and requiring reversal.  Quimby responds that the arbitration agreement came into effect after his claims arose, and the agreement does not cover the claims in his complaint which concern his credit disability insurance policy.  He also counters by raising contract defenses available under state law which operate to invalidate the arbitration clauses.  The ***Wedgeworth*** opinion and the circuit court's application are discussed below.

¶7.    In the ***Wedgeworth*** case, a poultry grower, Wedgeworth, contracted with a poultry processor, B.C. Rogers, to house and care for B.C. Rogers's live inventory.  ***Wedgeworth***, 911 So. 2d at 485.  The written contract between the parties contained an arbitration clause whose scope included 'all disputes arising under this agreement.'  ***Id.***  No other contract between the parties contained such a clause, and this clause did not state that it was applicable to disputes which existed before the contract's execution.  ***Id.*** at 487.  When Wedgeworth sued B.C. Rogers for coercion and interference with contracts, events which occurred prior to the execution of the contract between them, B.C. Rogers moved to compel arbitration. The circuit court denied the motion to compel arbitration.  On appeal, this court found that the scope of the arbitration agreement did not include the disputes in Wedgeworth's complaint nor did the arbitration clause's terms apply retroactively.  ***Id.*** at 489.  The circuit court's judgment was affirmed.

**I.** **Whether the trial court erred by incorrectly applying *B.C. Rogers Poultry, Inc. v. Wedgeworth*, 911 So. 2d 483 (Miss. 2005), and finding the arbitration provisions in AmSouth's March 1, 2004, Account Agreement not broad enough in temporal scope to cover a preexisting claim.**

¶8. AmSouth argues that three distinctions between the present case and *Wedgeworth* make the circuit court's reliance upon that case misplaced: (1) The arbitration provisions in this case are broader than those in *Wedgeworth*; (2) the March 17, 2000, and October 4, 2004, Customer Agreements contained an applicable arbitration clause that covered disputes prior to Quimby's alleged disability and lawsuit, unlike *Wedgeworth*'s limited coverage; and (3) *Wedgeworth*'s contract did not contain a *First Options* clause referring questions of arbitrability explicitly to the arbitrator.

¶9. First, AmSouth argues that the terms of its arbitration agreement in its Customer Agreements are broader than the terms in *Wedgeworth*. Three revised Customer Agreements are in the record.[3] They will be referenced by their effective dates: March 17, 2000; March 1, 2004; and October 4, 2004. Their scope and terms are examined below.

¶10. The March 17, 2000, revision of AmSouth's Customer Agreement covered "the use of any type of depository account you have with us, both personal and nonpersonal, except for time deposits, certificates of deposit, and IRAs." It defined depository account as "any type of account to which funds may be deposited." The arbitration clause read in pertinent part as follows:

> Any controversy, claim, or dispute between us (or between you and any of our employees, agents, representatives, parent or affiliated companies, or any of

---

[3]Also, one amendment to the March 1, 2004, Agreement is applicable to "depository accounts" whose arbitration terms are identical to the March 2004 Customer Agreement.

6

their employees) shall be settled by arbitration as set forth below. Such arbitration shall include, without limitations, any dispute or controversy regarding or pertaining in any way to any of the following (a) this agreement; (b) the Account; (c) any charge or cost incurred under this Agreement or the Account; (d) the collection of any amounts due under this Agreement or the Account; (e) any contract or alleged tort related to or arising out of your business or relationship with us; and (f) any statements or representations made to you. . . . Any disagreement as to whether a particular dispute or claim is subject to arbitration under this paragraph shall be decided by arbitration in accordance with the provisions of this paragraph. . . . WITH RESPECT TO DISPUTES SUBMITTED TO ARBITRATION, YOU AND WE EACH WAIVE ALL RIGHT TO A TRIAL BY JURY.

Also part of the March 2000 Customer Agreement was language permitting unilateral revision of the agreement. Acceptance of the revised terms was made "[b]y continuing to maintain your account."

¶11. The March 1, 2004, Customer Agreement covered "[Time Deposits or Certificates of Deposit, and Individual Retirement Accounts]. . . ; and any other type of depository account, both personal and nonpersonal. . . . As used herein, the term "account" shall mean and include any Time Deposit, Certificate, IRA or Deposit Account you have with us from time to time. The provisions in this Section 1 shall apply to all accounts you may have with us from time to time." The arbitration clause was contained in Section 6. The pertinent March 1, 2004, revision read as follows:

Except as expressly provided below, any controversy, claim, dispute or disagreement (any "Claim") arising out of, or in connection with or relating to (1) the interpretation, execution, administration or modification of the Agreement; (2) any account; (3) any charge or cost incurred pursuant to the Agreement; (4) the collection of any amounts due under the Agreement or any account; (5) any alleged tort arising out of or relating in any way to the Agreement or any account; (6) any breach of any provision of the Agreement; (7) any statements or representations made to you with respect to the Agreement or any account; or (8) any of the foregoing arising out of, in connection with, or relating to any agreement which relates to the Agreement

7

or any account; will be settled by binding arbitration with the Federal Arbitration Act.

The agreement also stated that by continuing to maintain the account, the customer agreed to the revised terms.

¶12.    The October 4, 2004, Customer Agreement covers:

> the use of the following accounts you may have with us: any AmSouth Time Deposit . . . or AmSouth Certificate of Deposit . . . ; any AmSouth Individual Retirement Account . . . ; and any other type of depository account, both personal and nonpersonal. . . . As used herein, the term "account" shall mean and include any Time Deposit, Certificate, IRA or Deposit Account you have with us from time to time. The provisions in this Section 1 shall apply to all accounts you may have with us from time to time. The dispute resolution provisions in section 6 of this Agreement also apply to any account, contract, loan, transaction, business, contact, interaction or relationship you may have with us. Further, as used in, or in relation to, or in interpreting any provision of this Agreement, the term "account" shall also include any account or other business relationship of any nature whatsoever you may hold from time to time with any of us.

The arbitration clause was contained in Section 6, and its terms were largely unchanged from the March 2004 agreement. Preceding the arbitration clause was the following language: "The following applies to all of the above referenced account types and agreements, as well as to any dispute you may have with us." Another revision to the October 4, 2004, Customer Agreement made arbitration an elective, as opposed to a mandatory, event. Once again, continued maintenance of an account constituted acceptance of the revised terms.

¶13.    The arbitration clauses in all of the revisions to the AmSouth Customer Agreement appear to be more broad than those in *Wedgeworth*. The October 4, 2004, revision, in particular, covered "any account or other business relationship of any nature whatsoever you may hold from time to time with any of us," and the arbitration clause within that agreement

8

applied to "any dispute you may have with us." AmSouth also argues that Quimby's use of his other accounts with AmSouth may have been sufficient to bind the disputes concerning his line of credit account over to arbitration under the terms of the October 2004 revisions to the Customer Agreement. His checking accounts were clearly depository accounts covered by the revised agreements. He agreed in his signature card on at least one of these accounts to abide by the "rules and regulations and all amendments" to his account agreements. By the express terms of the Customer Agreements his "continuing to maintain" any of those accounts constituted acceptance of the terms of the revised agreements, and the October 2004 Customer Agreement bound over to arbitration "any dispute you may have with us."

¶14. We find, however, the line of credit account was not governed by the March 2000 and March 2004 Customer Agreements, and this court's holding in *Wedgeworth* requires specific, retroactive language within an arbitration agreement before we will find a preexisting controversy within its scope. Under this interpretation, the October 2004 revised Customer Agreement does not apply retroactively to cover the claims in Quimby's complaint. Therefore, analyzing this matter under *East Ford*, we conclude the circuit court had the authority to determine whether Quimby's claims were within the scope of the AmSouth Customer Agreements, and that it correctly decided that they were not. *East Ford, Inc.*, 826 So. 2d at 713.

¶15. From the sparse record before the court, it appears the term "line of credit" is undefined by either party or by any revised AmSouth Customer Agreement. During the hearing on the motion to compel arbitration, counsel for AmSouth referred to this account

9

as a "loan." Neither party indicates the nature of this line of credit. Black's Law Dictionary defines "line of credit" simply as:

> A margin or fixed limit of credit granted by one to another, to the full extent of which the latter may avail himself in his dealings with the former, but which he must not exceed; usually intended to cover a series of transactions, in which case, when the customer's line of credit is nearly or quite exhausted, he is expected to reduce his indebtedness by payments before drawing upon it further.

Black's Law Dictionary 1078 (Rev. 4th ed. 1968) (citing *Pittinger v. Southwestern Paper Co. of Fort Worth*, 151 S.W.2d 922, 925 (Tex. Civ. App. 1941)). There is no indication in the record whether this account is a secured line of credit, such as a home-equity line of credit, or an unsecured line of credit, such as a consumer credit card. No signature card appears in the record for this account. It is assumed throughout the record that Quimby is the debtor and AmSouth and its predecessors are the creditors. The parties appear to agree that Quimby's claims are tied to opening the line of credit with Deposit Guaranty.

¶16. The Mississippi Uniform Commercial Code (UCC)–Negotiable Instruments generally defines an "account" as "any deposit or credit account with a bank, including a demand, time, savings, passbook, share draft, or like account, other than an account evidence by a certificate of deposit." Miss. Code Ann. § 75-4-104(3) (Rev. 2002). A "deposit account" is defined under the UCC–Secured Transactions as "a demand, time, savings, passbook, or similar account maintained with a bank. The term does not include investment property or accounts evidenced by an instrument." Miss. Code Ann. § 75-9-102(29) (Rev. 2002). This Court has held "funds deposited to a general account belong to the bank, with the bank becoming the debtor to the owner of the account for the amount of the deposit." *First Investors Corp. v.*

10

*Rayner*, 738 So. 2d 228, 235 (Miss. 1999) (quoting *Deposit Guar. Nat'l Bank v. B.N. Simrall & Son, Inc.*, 524 So. 2d 295, 299 (Miss. 1987)). Under Mississippi law, Quimby's line of credit may qualify as an "account," but not as a deposit account. The AmSouth Customer Agreements further narrow the definition of "account" to the point that they exclude the line of credit account.

¶17. The March 2000 Customer Agreement defined "account or depository account" as "any type of account to which funds may be deposited." Section 4-104 of the UCC differentiates between deposit and credit accounts, but includes both in its general definition of account. Miss. Code Ann. § 75-4-104(3). However, the definition in AmSouth's March 2000 Customer Agreement was narrower and applied only to "depository accounts," among other non-credit and unrelated accounts. The March 2004 Customer Agreement covered only "[Time Deposits or Certificates of Deposit, and Individual Retirement Accounts]. . . ; and any other type of depository account, both personal and nonpersonal. . . . As used herein, the term "account" shall mean and include any Time Deposit, Certificate, IRA or Deposit Account you have with us from time to time." This Customer Agreement likewise limited its application to accounts into which funds were placed or kept, rather than where debts were to be repaid.

¶18. The cover of the March 2000 Customer Agreement read "Customer Agreement for Depository Accounts," "Time Deposit/Certificate of Deposit Agreement," and "Individual Retirement Accounts Investment Agreements." The cover of the March 2004 Customer Agreement read "Important information about your Checking, Money Market, Savings, Time Deposit and IRA accounts; your Electronic Banking services; and more."

11

¶19. From the exhibits in the record before the court, we find that Quimby's line of credit account, or loan, does not fall within the meaning of the various depository accounts listed and defined in the March 2000 and March 2004 Customer Agreements. Even if there is ambiguity within the Customer Agreements such that an argument could be made for its inclusion, this Court construes ambiguity within a contract against the drafter. *Banks v. Banks*, 648 So. 2d 1116, 1121 (Miss. 1994). We therefore conclude that the March 2000 and March 2004 revised Customer Agreements, by their terms, did not cover Quimby's line of credit account.

¶20. The March 2004 and October 2004 Customer Agreements did not cover Quimby's claims for another reason: There was no explicit, retroactive application language in any of the arbitration clauses. AmSouth relied on the use of the word 'any' in its Customer Agreements to indicate retroactive application. For example, the October 2004 arbitration clause stated a party may elect that "*any* controversy . . . relating to . . . *any* account. . ." be resolved by arbitration. The March 2004 Customer Agreement likewise covered "*any* account" or "the collection of any amounts due under the Agreement or *any* account."

¶21. This court's opinion in *Wedgeworth* indicated the Court's intent that explicit language of retroactive application appear in arbitration clauses before they will be enforced on preexisting claims. It also left the Court room to insist upon this language in arbitration agreements. The court stated in *Wedgeworth*, "[h]ere, the arbitration provision contained neither language that was broad enough to cover events which predated the contract's execution, nor language which would broaden its application by containing terms such as 'applies to all transactions occurring before or after execution' or 'all transactions between

us' or 'all business with us.' Where such clause exists, a legal basis to apply the arbitration clause retroactively *may* exist." ***Id.*** at 489 (emphasis added). By indicating a preference for specific, retroactive application language in arbitration agreements, and using the permissive "may" to indicate that it was not bound to find retroactive application even if an arbitration agreement's language was broader than that in ***Wedgeworth***, the court left itself room to find AmSouth's clauses insufficient to apply retroactively. Even without this leeway within this Court's precedent, there is evidence in the record that AmSouth did not intend its Customer Agreements to apply retroactively.

¶22.    In support of its motion to compel arbitration, AmSouth offered the affidavit of Kimberly Burkhalter, an AmSouth employee, which states that the dates of the Customer Agreements were the dates their terms became 'effective'; e.g., the March 17, 2000, Customer Agreement became effective on that date, and so on. Even if implied acceptance by continued use of the account was sufficient to bind Quimby to the arbitration terms in the March 2004 and October 2004 Customer Agreements, the effective dates of the Customer Agreements occurred after the accrual of his claims against AmSouth and American Heritage.

¶23.    Despite the federal policy favoring arbitration, our courts are required to submit to arbitration only what the parties agreed to submit to arbitration. ***Adams v. Greenpoint Credit, LLC***, 943 So. 2d 703, 708 (Miss. 2006) (citing ***AT&T Technologies, Inc. v. Communications Workers of America***, 475 U.S. 643, 648, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986)). The testimony within the Burkhalter affidavit provides sufficient indication that AmSouth intended the revised terms in these agreements to apply prospectively from

13

their effective dates. We therefore conclude, on the record before the court, that the parties intended the revisions to the Customer Agreements to apply prospectively to claims which occurred after their stated effective dates.

¶24. Therefore, we find another reason in the record that the March 2004 and October 2004 Customer Agreements did not cover the claims made in Quimby's complaint. This court's precedent does not require it to give retroactive application to the language found within the March 2004 and October 2004 Customer Agreements. Our precedent requires this court to enforce arbitration agreements only to the extent the parties agreed to submit their claims to arbitration. There being sufficient evidence in the record of an intent to apply prospectively the terms in AmSouth's customer agreements, we find the circuit court's judgment to have merit.

¶25. The record indicates that Quimby's pursuit of his claims began after his disability, but before the effective dates of the 2004 Customer Agreements. A letter from American Heritage to Quimby's counsel, dated November 19, 2002, indicated that Quimby's failure to submit a proper notice of disability claim would result in the denial of benefits for lack of coverage. This letter is proof within the record that Quimby's claims pre-dated the effective dates of the 2004 Customer Agreements. The record also demonstrates that retroactive application language does not appear in the arbitration clauses in the AmSouth Customer Agreements.

¶26. Therefore, we conclude that the March 2000 and March 2004 AmSouth Customer Agreements did not cover the line of credit account. Furthermore, the March 2004 and October 2004 effective dates for the AmSouth Customer Agreement post-date the accrual of

14

Quimby's cause of action against AmSouth. The Court's precedent in *Wedgeworth* indicates that such clauses are not to be given retroactive force unless the clause contains specific language stating so, and the parties so intended. The language in the 2004 Customer Agreements did not do so, relying on the use of the term 'any' to imply a retroactive application. Since it appears that the parties intended the provisions in the revised Customer Agreements to apply prospectively, not retroactively, the circuit court's judgment applying *Wedgeworth* to the facts was not in error and is affirmed. The first reason AmSouth offers to require enforcement of the arbitration clause found within its Customer Agreements, that the scope of the agreement is broader than that in *Wedgworth*, is insufficient to require reversal of the circuit court's judgment.

¶27.    Second, AmSouth argues that its revised Customer Agreement contains an arbitration clause that became effective March 17, 2000, and covers this dispute because its effective date preceded Quimby's disability claim. The March 2000 revision indeed contained an arbitration clause. Its effective date preceded Quimby's disability claim and the accrual of his right of action against American Heritage and AmSouth for benefits and damages for emotional distress and tortious breach of contract. However, as noted above, the March 2000 Customer Agreement applied to specific types of accounts which did not include line of credit accounts. By its own terms, the March 2000 Customer Agreement did not apply to line of credit accounts. Therefore, this reason is insufficient to find the trial court in error.

¶28.    Third, AmSouth argues that the circuit court should not have applied *Wedgeworth* because the explicit terms of the revised Customer Agreements submitted all questions concerning the scope of the arbitration agreement to the arbitrator. In *First Options of*

15

*Chicago v. Kaplan*, the United States Supreme Court examined the narrow question of who should have the primary power to decide whether the parties to a contract agreed to arbitrate their claim. *First Options of Chicago v. Kaplan*, 514 U.S. 940, 942, 115 S.Ct. 1920, 131 L.Ed.2d 985, 992 (1995). It determined that "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *Id.* at 944 (citations and quotations removed).

¶29.    After reviewing the opinion in *Wedgeworth*, it appears that no agreement existed to submit questions concerning the scope of the arbitration clause to the arbitrator within the Wedgeworth agreement. Such an agreement undoubtedly existed in all of the revised Customer Agreements in the record.[4] Since the March 2000 Customer Agreement, by its own terms, did not cover Quimby's line of credit account, no revised Customer Agreement predating Quimby's disability claim required the question of arbitrability to be submitted to an arbitrator. Since we hold above that the arbitration clauses in AmSouth's Customer Agreements must have specific retroactive application language to govern prior disputes, and that it was the parties' intent for the revisions to the Customer Agreements to apply prospectively, it is immaterial whether subsequent Customer Agreements submitted the question of the scope of the arbitration clause to an arbitrator. Because the March 2004 and October 2004 Customer Agreements post-dated Quimby's claims, the clauses submitting the

---

[4]For instance, the March 2000 Customer Agreement provides: "Any disagreement as to whether a particular dispute or claim is subject to arbitration under this paragraph shall be decided by arbitration in accordance with the provisions in this paragraph."

16

question of arbitrability to the arbitrator did not cover his claims. This ground is likewise insufficient to find the circuit court in error.

¶30. In summary, the circuit court used the ***Wedgeworth*** opinion to find that Quimby's claims were not covered by a valid arbitration clause. After the analysis above, we agree with and affirm its judgment. AmSouth's arguments to the contrary fail to pass analysis under ***East Ford***. The following issues were argued before the trial court. While they did not form the basis of the court's ruling, both parties address the issues and so they are addressed briefly here.

## II. Whether the trial court erred by not following *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995), and proceeding to decide the issue of temporal scope of the arbitration provisions, when those provisions expressly reserve that issue for the arbitrator.

¶31. This issue is examined more fully above. AmSouth argues that the trial court erred in deciding the scope of the arbitration agreement within the Customer Agreement because the agreement specifically referred such questions to the arbitrator. Quimby responds that state law principles of consideration, definite terms, mutual assent, and unconscionability apply to invalidate the arbitration clause in the Customer Agreement such that the Court was not bound to enforce its terms.

¶32. While each of the three Customer Agreements did contain a readily-identifiable agreement to submit the question of the scope of the arbitration agreement to the arbitrator, the analysis above demonstrates that none of the revised AmSouth Customer Agreements covered Quimby's claims such that he was bound to arbitration. Therefore, the presence of

this clause in the Customer Agreements does not require the court to enforce arbitration, and this issue is without merit.

**III.  Whether the trial court erred by failing to find the Parties bound to arbitrate a preexisting claim under the broad "any dispute" temporal scope provisions of AmSouth's October 4, 2004 amended Account Agreement.**

¶33.  This issue also is discussed above.  The arbitration clauses in the March and October 2004 Customer Agreements were insufficient under Mississippi law to receive retroactive application, because they did not contain specific terms stating so and the intent of the parties was for prospective application of the revisions to the Customer Agreements.  While the March 17, 2000, Customer Agreement contained an arbitration clause, its terms did not cover line of credit accounts.  Therefore, the use of the term 'any' within the October 2004 Customer Agreement was insufficient to bind Quimby's claims over to arbitration.  This issue is without merit, and the circuit court's judgment is affirmed.

**IV.  Whether section I of *Union Planters Bank, National Association v. Rogers*, 912 So. 2d 116 (Miss. 2005), which failed to find an arbitration contract by performance, should be overruled due to its conflict with *Perry v. Thomas*, 482 U.S. 483 (1987) and *Doctor's Associates, Inc. v. Cassarotto*, 517 U.S. 681 (1996), which prohibit applying stricter scrutiny to the formation of an arbitration contract than any other contract?**

**V.  Whether Section I of *Union Planters Bank* should be overruled due to its conflict with *Perry* and *Cassarotto*, which mandate application of the Mississippi Uniform Commercial Code to the arbitration provisions at issue in a nondiscriminatory manner, thus allowing the adoption of the entirety of an account agreement (including its arbitration provisions) through maintenance or use of the account, by implication, ratification, estoppel and course of performance?**

**VI.  Whether Section I of *Union Planters Bank* should be overruled due to its conflict with *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967), which prohibits invalidating arbitration provisions based upon a defense equally applicable to the account agreement as a whole–such as the method of adoption of the account agreement?**

¶34.    AmSouth uses the next three issues to argue that this court should overrule *Union Planters Bank, National Association v. Rogers*, 912 So. 2d 116 (Miss. 2005).  This court will not address *Rogers* for two reasons.  First, the issue was not argued before the trial court and it was given no opportunity to rule on this issue.  The court did not cite *Rogers* in its opinion and it serves as no basis for the court's ruling.  This Court has stated, "[w]e accept without hesitation the ordinarily sound principle that this Court sits to review actions of trial courts and that we should undertake consideration of no matter which has not first been presented to and decided by the trial court."  *Educ. Placement Serv. v. Wilson*, 487 So. 2d 1316, 1320 (Miss. 1986).  We find no reason to depart from this practice now.

¶35.    Second, *Rogers*, is distinguishable.  The mail-outs in *Rogers*, while bearing a striking resemblance to the Customer Agreements examined here, contained conflicting provisions which the court concluded required existing bank customers to execute a signature card <u>and</u> use their accounts before becoming bound by the arbitration agreement.  *Union Planters Bank, Nat'l Ass'n v. Rogers*, 912 So. 2d 116, 120 (Miss. 2005).  The AmSouth Customer Agreements do not appear to conflict in this way.

¶36.    Further, *Rogers* concerned a checking account, or depository account, and the record contained the original signature card on the account, which bound Rogers to its terms.  Quimby's account is a line of credit, and no signature card for this account nor any original contract stating the initial terms of the account appears in the record.  Neither does the record contain any copy of any credit life or credit disability insurance policy applicable to Quimby.  We find these reasons sufficient to forego an examination of *Rogers* in this case.

19

¶37. Ordinarily, in a claim against a credit disability policy case, we would expect to find within the record the credit disability policy or the loan agreement. In this case, we have neither before us, nor do we know whether either contains an agreement to arbitrate within its terms. The record does not even indicate whether Quimby owed any money at the time of his disability such that he may be entitled to benefits under a credit disability policy. Given these deficiencies in the record, we find no basis in the record for reversal.

## CONCLUSION

¶38. The circuit court did not err when it relied upon the *Wedgeworth* case to deny arbitration. The terms of the arbitration clauses in the revised customer agreements were more broad than *Wedgeworth*, but contained no specific language of retroactive application to bind Quimby to its terms. Since Quimby's line of credit account is not covered by an arbitration clause which became effective before the accrual of his action and claim for damages, *Wedgeworth* supports the court's decision to deny arbitration and retain jurisdiction of this matter. Therefore, we affirm the judgment of the circuit court and remand this matter for further proceedings.

¶39. **AFFIRMED.**

**SMITH, C.J., EASLEY, CARLSON, DICKINSON, RANDOLPH AND LAMAR, JJ., CONCUR. DIAZ, P.J., AND GRAVES, J., CONCUR IN RESULT ONLY.**