# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2003-CA-02221-SCT

*UNION PLANTERS BANK,*
*NATIONAL ASSOCIATION*

**v.**

*NEAL DONIPHAN ROGERS, JR.,*
*EXECUTOR OF THE ESTATE OF*
*HELEN ROGERS, DECEASED,*
*a/k/a HELEN K. ROGERS*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/04/2003 |
| TRIAL JUDGE: | HON. W. ASHLEY HINES |
| COURT FROM WHICH APPEALED: | WASHINGTON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | CHARLES J. SWAYZE, JR. |
| ATTORNEY FOR APPELLEE: | NATHAN P. ADAMS, JR. |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | REVERSED AND RENDERED - 04/28/2005 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**WALLER, PRESIDING JUSTICE, FOR THE COURT:**

¶1. This appeal involves an issue of first impression in Mississippi – the interpretation of Miss. Code Ann. § 75-4-406 (Rev. 2002), which imposes duties on banks and their customers insofar as forgeries are concerned. The case arises from a series of forgeries made by one person on four checking accounts maintained by Helen Rogers at the Union Planters Bank. We find that the circuit judge erred in denying Union Planters' motion for JNOV because, under § 75-4-406, Rogers failed to inspect her bank statements in a timely manner and because

Rogers produced no evidence that Union Planters had failed to exercise ordinary care or that Union Planters acted with bad faith in paying the checks.

**FACTS**

¶2. Neal D. and Helen K. Rogers[1] maintained four checking accounts with the Union Planters Bank in Greenville, Washington County, Mississippi. Each of these four accounts had originally been opened at banks (the Sunburst Bank, the Magnolia Federal Savings Bank; and the Washington Federal Savings Bank) which later merged with Union Planters. The Rogers were both in their eighties when the events which gave rise to this lawsuit took place. After Neal became bedridden, Helen hired Jackie Reese to help her take care of Neal and to do chores and errands.

¶3. In September of 2000, Reese began writing checks on the Rogerses' four accounts and forged Helen's name on the signature line. Some of the checks were made out to "cash," some to "Helen K. Rogers," and some to "Jackie Reese." The following chart summarizes the forgeries to each account:[2]

---

[1]Neal Rogers died prior to the institution of this lawsuit. Helen Rogers died after Union Planters filed this appeal. We have substituted Helen's estate as appellee.

[2]Detailed lists of the forged checks are found as attachments to the complaint and will not be reproduced in this opinion.

| ACCOUNT NUMBER | BEGINNING | ENDING | NUMBER OF CHECKS | AMOUNT OF CHECKS |
|---|---|---|---|---|
| 54282309 | 11/27/2000 | 6/18/2001 | 46 | $16,635.00 |
| 0039289441 | 9/27/2000 | 1/25/2001 | 10 | $2,701.00 |
| 6100110922 | 11/29/2000 | 8/13/2001 | 29 | $9,297.00 |
| 6404000343 | 11/20/2000 | 8/16/2001 | 83 | $29,765.00 |
| **TOTAL** | | | **168** | **$58,398.00** |

¶4.     Neal died in late May of 2001.  Shortly thereafter, the Rogerses' son, Neal, Jr., began helping Helen with financial matters.  Together they discovered that many bank statements were missing and that there was not as much money in the accounts as they had thought.[3]  In June of 2001, they contacted Union Planters and asked for copies of the missing bank statements.  In September of 2001, Helen was advised by Union Planters to contact the police due to forgeries made on her accounts.  More specific dates and facts leading up to the discovery of the forgeries are not found in the record.

¶5.     Subsequently, criminal charges were brought against Reese.[4]  In the meantime, Helen filed suit against Union Planters, alleging conversion (unlawful payment of forged checks) and negligence.  After a trial, the jury awarded Helen $29,595 in damages, and the circuit court entered judgment accordingly.  From this judgment, Union Planters appeals.

_____

[3]For instance, Helen thought one account balance should have been around $17,000.00, when it was in fact around $800.00.

[4]The record does not reveal the disposition of the criminal proceedings against Reese.

3

**DISCUSSION**

## I. WHETHER THE CIRCUIT JUDGE ERRED IN DENYING UNION PLANTERS' MOTION TO COMPEL ARBITRATION.

¶6. After its acquisition of the Sunburst Bank, the Magnolia Federal Savings Bank and the Washington Federal Savings Bank, Union Planters sent many mailings to its customers outlining the duties and responsibilities of the bank to the customers and of the customers to the bank. Contained in one of the mail-outs was an arbitration clause which included the following language:

> BY SIGNING A SIGNATURE CARD AND USING YOUR ACCOUNT YOU AGREE TO THE TERMS OF THIS ARBITRATION AGREEMENT. BY SIGNING YOUR SIGNATURE CARD YOU ACKNOWLEDGE THAT YOU HAVE READ AND UNDERSTAND THIS ARBITRATION AGREEMENT, INCLUDING THE WAIVER OF YOUR RIGHT TO A JURY TRIAL OR TRIAL BY A JUDGE IN A PUBLIC COURT.

The circuit judge ruled that the arbitration clause was not enforceable because, even though Rogers had signed signature cards with the individual banks prior to merger, she had never signed a signature card for Union Planters containing an arbitration clause.

¶7. Union Planters argues that whether Rogers signed a Union Planters signature card is immaterial because many of the mail-outs had the following or similar language: "Your continued use of the Account evidences your agreement to any amendment." Since Rogers continued to use her accounts, it contends, she agreed to the amendment which added the arbitration clause. Union Planters also cites to *Herrington v. Union Planters Bank*, 113

F. Supp. 2d 1026 (S.D. Miss. 2000), *aff'd*, 265 F.3d 1059 (5th Cir. 2001), which dealt with almost identical facts. There, United States District Judge Walter Gex held as follows:

> When the plaintiffs signed their initial signature cards [from a bank before it merged with Union Planters], they agreed that the terms and conditions of their deposit accounts could change in the future upon sufficient notice. It is undisputed that the plaintiffs were given notice in March of 1998 that their accounts were being revised to include an arbitration clause. It is further undisputed that the plaintiffs continued to use their accounts after the effective date of the arbitration clause. . . .

> \* \* \*

> The cover letter accompanying the "revised Deposit Account Agreement" explicitly informed the plaintiffs that the revised deposit agreement contained "important information about [the depositor's] [sic] account." After reviewing the letter and revised deposit agreement, the Court finds that the plaintiffs were sufficiently notified that the terms and conditions of their accounts would change . . . . The plaintiffs' apparent failure to read the revisions to their accounts is irrelevant to the issue of whether they agreed to arbitrate or are subject to those changes.

> \* \* \*

> The absence of the plaintiffs' signature on a new card does not alter the fact that the plaintiffs accepted the terms of the arbitration agreement by continuing to utilize their accounts. The plaintiffs could have simply declined to accept the arbitration provision by terminating their account before the effective date of the amendment. Because the plaintiffs continued performance under the revised deposit agreements. . , the Court finds that the plaintiffs agreed to arbitrate their disputes with Union Planters.

113 F. Supp. 2d at 1031-32 (citations omitted).

¶8.     A review of arbitration law and contract law leads us to a different conclusion. Submitting to arbitration means giving up the right to file a lawsuit in a court of competent jurisdiction. Waiving that right requires more than implied consent:

> Waiver presupposes full knowledge of a right existing, and an intentional surrender or relinquishment of that right. It contemplates something done designedly or knowingly, which modifies or changes existing rights or varies or changes the terms and conditions of a contract. It is the voluntary surrender of a right. To establish a waiver, there must be shown an act or omission on the part of the one charged with the waiver fairly evidencing an intention permanently to surrender the right alleged to have been waived.

*Ewing v. Adams*, 573 So. 2d 1364, 1369 (Miss. 1990). We find absolutely no evidence that either of the Rogerses voluntarily and knowingly waived their right to access to the courts. As another federal district court has held:

> [T]his court has no hesitation in finding that the parties never agreed to arbitration and that plaintiff did not waive her right to seek adjudication of her claims in court. The application was the only document plaintiff ever signed; there is, of course, no mention in its contents of the arbitration endorsement. That endorsement is part of the insurance contract which plaintiff received upon completion of the application process. When plaintiff received the policy, she was given the option of "return[ing] it for any reason," in which case, the policy was "void from the beginning...." There was no notice, no discussion, and no negotiation of the arbitration endorsement, circumstances, which, in this court's view, hardly signify either agreement or waiver. The arbitration endorsement is therefore not enforceable, and this matter may proceed in this court.

*McCreary v. Liberty Nat'l Life*, 6 F. Supp. 2d 920, 920-21 (N.D. Miss. 1998) (quoted with favor in *Pre-Paid Legal Servs., Inc. v. Battle*, 873 So. 2d 79, 83 (Miss. 2004)). *See also*

6

*Stone v. Golden Wexler & Sarnese, P.C.*, 341 F. Supp. 2d 189 (E.D.N.Y. 2004) (arbitration agreement not binding without express or implicit consent by customer); *Gustavsson v. Washington Mut. Bank*, 850 So. 2d 570 (Fla. Dist. Ct. App. 2003) (same); *DIRECTV, Inc. v. Mattingly*, 829 A.2d 626 (Md. 2003) (citing *Mattingly v. Hughes Electronics Corp.*, 810 A.2d 498 (Md. Ct. Spec. App. 2001)) (where contract mandated written notice of changes and written notice of addition of arbitration clause was not given, arbitration was not binding on customer).

¶9.     As in *McCreary* and *Pre-Paid*, the Rogerses signed signature cards for the four banks prior to their merger with Union Planters, and these signature cards did not contain   arbitration provisions.

¶10.    The use of basic contract construction rules also leads us to the conclusion that the Rogerses were not bound by Union Planters' arbitration provision.   A cardinal rule of construction of a contract is to ascertain the mutual intentions of the parties.   *Miss. Transp. Comm'n v. Ronald Adams Contractor, Inc.*, 753 So. 2d 1077, 1084 (Miss. 2000).   Intent should first be sought in an objective reading of the words employed in the contract.   *Id.*  We find that the general provisions of the mail-outs and the specific provisions of the arbitration clause are in conflict (i.e., the general provisions require "use" of the account only, whereas the specific provisions   of the arbitration clause require "use" of the account *and* the execution of a signature card), causing ambiguity.   Ambiguities in a contract are to be construed against the party who drafted the contract.   *Id.* at 1085.   And specific language controls over general

7

inconsistent language in a contract. *Id.* Construing the ambiguities against Union Planters, the drafter of the contract, we find that the specific provisions of the arbitration clause supplant the general provisions.

¶11. Therefore, because Rogers did not execute a new signature card after Union Planters bought out the various banks, the arbitration clause does not apply to her, and the circuit judge was correct in denying Union Planters' motion to compel arbitration.

¶12. We are aware that there is a split in authority on this issue and that other jurisdictions which have held that the right of access to the courts may be implicitly waived. *Cf.*, *e.g.*, *Jureczki v. Banc One Texas, N.A.*, 252 F. Supp. 2d 368 (S.D. Tex.), *aff'd*, 75 Fed. Appx. 272 (5th Cir. 2003) (arbitration agreement in force at time of execution of bank signature card valid even though customer claimed ignorance thereof); *Goetsch v. Shell Oil Co.*, 197 F.R.D. 574 (W.D.N.C. 2000) (notice of change of terms in credit card agreement sufficient to bind customer to arbitration provision where customer continued to use account); *SouthTrust Bank v. Williams*, 775 So. 2d 184 (Ala. 2000) (same). However, we find that waiving the right to have access to the courts is something much more significant and of a different character than changing the terms and conditions of a bank account, assent for which can be obtained simply by the continued use of the account. *See McCreary, Stone, Gustavsson and Mattingly*, *supra*.

## II. WHETHER ROGERS' DELAY IN DETECTING THE FORGERIES BARRED SUIT AGAINST UNION PLANTERS.

8

¶13. The relationship between Rogers and Union Planters is governed by Article 4 of the Uniform Commercial Code, enacted in Miss. Code Ann. §§ 75-4-101 through -504 (Rev. 2002). Section 75-4-406(a) & (c)[5] provide that a bank customer has a duty to discover and report "unauthorized signatures"; i.e., forgeries.[6] Section 4-406 of the UCC reflects an underlying policy decision that furthers the UCC's "objective of promoting certainty and predictability in commercial transactions." The UCC facilitates financial transactions, benefitting both consumers and financial institutions, by allocating responsibility among the parties according to whomever is best able to prevent a loss. Because the customer is more

---

[5]Miss. Code Ann. § 75-4-406(a) & (c) (Rev. 2002) provide as follows:

(a) A bank that sends or makes available to a customer a statement of account showing payment of items for the account shall either return or make available to the customer the items paid or provide information in the statement of account sufficient to allow the customer reasonable to identify the items paid. The statement of account provides sufficient information if the items is described by item number, amount, and date of payment.

* * *

(c) If a bank sends or makes available a statement of account or items pursuant to subsection (a), the customer must exercise reasonable promptness in examining the statement or the items to determine whether any payment was not authorized because of . . . a purported signature by or on behalf of the customer was not authorized. If, based on the statement or items provided, the customer should reasonably have discovered the unauthorized payment, the customer must promptly notify the bank of the relevant facts.

[6]Miss. Code Ann. § 75-3-403(a) (Rev. 2002) states that "an unauthorized signature is ineffective except as the signature of the unauthorized signer in favor of a person who in good faith pays the instrument or takes it for value."

familiar with his own signature, and should know whether or not he authorized a particular withdrawal or check, he can prevent further unauthorized activity better than a financial institution which may process thousands of transactions in a single day. Section 4-406 acknowledges that the customer is best situated to detect unauthorized transactions on his own account by placing the burden on the customer to exercise reasonable care to discover and report such transactions. The customer's duty to exercise this care is triggered when the bank satisfies its burden to provide sufficient information to the customer. As a result, if the bank provides sufficient information, the customer bears the loss when he fails to detect and notify the bank about unauthorized transactions. *See, e.g., **Am. Airlines Employees Fed. Credit Union v. Martin***, 29 S.W.3d 86, 92 (Tex. 2000).

A.     Union Planters' Duty to Provide Information under § 75-4-406(a).

¶14.    The court admitted into evidence copies of all Union Planters statements sent to Rogers during the relevant time period. Enclosed with the bank statements were either the cancelled checks themselves or copies of the checks relating to the period of time of each statement. The evidence shows that all bank statements and cancelled checks were sent, via United States Mail, postage prepaid, to all customers at their "designated address" each month. Rogers introduced no evidence to the contrary. We therefore find that the bank fulfilled its duty of making the statements available to Rogers and that the remaining provisions of § 75-4-406 are applicable to the case at bar. *See **Whitney Nat'l Bank v. Baker***, 122 S.W.3d 204, 208 (Tex. Ct. App. 2003) (bank's duty under § 4-406 is satisfied when bank sends regular monthly statements to customer).

10

¶15. In defense of her failure to inspect the bank statements, Rogers claims that she never received the bank statements and cancelled checks. Even if this allegation is true,[7] it does not excuse Rogers from failing to fulfill her duties under § 75-4-406(a) & (c) because the statute clearly states a bank discharges its duty in providing the necessary information to a customer when it "*sends . . .* to a customer a statement of account showing payment of items." *See* Miss. Code Ann. § 75-4-406(a) (emphasis added). *See also* **Stowell v. Cloquet Co-op Credit Union**, 557 N.W.2d 567 (Minn. 1997) (once bank statements placed in mail, account holder bears risk statements will be lost or intercepted). The word "receive" is absent. The customer's duty to inspect and report does not arise when the statement is received, as Rogers claims; the customer's duty to inspect and report arises when the bank sends the statement to the customer's address. A reasonable person who has not received a monthly statement from the bank would promptly ask the bank for a copy of the statement. Here, Rogers claims that she did not receive numerous statements. We find that she failed to act reasonably when she failed to take any action to replace the missing statements.

        B.      Rogers' Duty to Report the Forgeries under § 75-4-406(d).

¶16. A customer who has not promptly notified a bank of an irregularity may be precluded from bringing certain claims against the bank:

> (d)     If the bank proves that the customer failed, with respect to
>         an item, to comply with the duties imposed on the

---

[7]Since there was a series of forged checks, it is reasonable to assume that Reese intercepted the bank statements before Rogers could inspect them. However, Union Planters cannot be held liable for Reese's fraudulent concealment.

11

customer by subsection (c), the customer is precluded from asserting against the bank:

> (1)  The customer's unauthorized signature . . . on the item, if the bank also proves that it suffered a loss by reason of the failure; . . .

Miss. Code Ann. § 75-4-406(d)(1).

¶17.  Also, when there is a series of forgeries, § 75-4-406(d)(2) places additional duties on the customer:

> (2)  The customer's unauthorized signature . . . by the same wrongdoer on any other item paid in good faith by the bank if the payment was made before the bank received notice from the customer of the unauthorized signature . . . and after the customer had been afforded a reasonable period of time, not exceeding thirty (30) days, in which to examine the item or statement of account and notify the bank.

*Id.*  A bank may shorten the customer's thirty-day period for notifying the bank of a series of forgeries, and here, Union Planters shortened the thirty-day period to fifteen days.  The statute states that a customer must report a series of forgeries within "a reasonable period of time, *not exceeding* thirty (30) days, . ."  "The 30-day period is an outside limit only.  However 30 days is presumed to be reasonable and the bank bears the burden of proving otherwise."  Lawrence's Anderson on the Uniform Commercial Code § 4-406:19, at 423 (3d ed. 2000); *see also Flagship Bank of Seminole v. Complete Interiors, Inc.* 450 So. 2d 337 (Fla. Dist. Ct. App. 1984).

¶18.  Although there is no mention of a specific date, Rogers testified that she and her son began looking for the statements in late May or early June of 2001, after her husband had died.

12

Her son felt that it was prudent to consolidate some of the five bank accounts. When they discovered that statements were missing, they notified Union Planters in June of 2001 to replace the statements. At this time, no mention of possible forgery was made, even though Neal, Jr., thought that "something was wrong." In fact, Neal, Jr., had felt that something was wrong as far back as December of 2000, but failed to do anything. Neal, Jr., testified that neither he nor his mother knew that Reese had been forging checks until September of 2001.[8] Courts in Louisiana and Texas have held that, under similar circumstances, a customer's claims against a bank for paying forged checks are without merit. *See Marx v. Whitney Nat'l Bank*, 713 So. 2d 1142 (La. 1998); *Ju-Nel Homes, Inc. v. White Rock Bank of Dallas*, 632 S.W.2d 648 (Tex. Ct. App. 1982).

¶19. Rogers is therefore precluded from making claims against Union Planters because (1) under § 75-4-406(a), Union Planters provided the statements to Rogers, and (2) under § 75-4-406(d)(2), Rogers failed to notify Union Planters of the forgeries within 15 and/or 30 days of the date she should have reasonably discovered the forgeries.

### III. WHETHER THE CIRCUIT COURT ERRED IN DENYING UNION PLANTERS' MOTIONS FOR DIRECTED VERDICT AND/OR JNOV.

¶20. We find that the circuit court erred when it denied Union Planters' motions for directed verdict and/or JNOV. Miss. Code Ann. § 75-4-406(e) (Rev. 2002) provides that the preclusion

---

[8]Actually, it was Union Planters that notified Rogers that there had been forgeries, as opposed to Rogers' discovering the forgeries herself.

to bring claims against a bank may not apply if a customer "proves that the bank failed to exercise ordinary care in paying the item and that the failure substantially contributed to [the] loss."[9]

¶21. The only evidence put on by Rogers during her case-in-chief was live testimony by Rogers and her son, Neal, Jr., and the deposition testimony of three Union Planters officers. Most of this testimony pertained to the facts underlying the investigation into the forgeries. The only testimony regarding Union Planters' policies was elicited from Diane Towles, who said that it was not Union Planters' practice to inspect a signature card every time a check was presented for payment. Under the statute, the *only* way Rogers could escape preclusion of her claims was to prove that Union Planters failed to exercise ordinary care in the payment of the forged checks. Rogers presented absolutely no evidence concerning Union Planters' alleged failure to exercise ordinary care, much less present expert testimony on what ordinary care in the banking business would be.

---

[9]Miss. Code Ann. § 75-4-103(7) (Rev. 2002) provides as follows:

> "Ordinary care" in the case of a person engaged in business means observance of reasonable commercial standards, prevailing in the area in which the person is located, with respect to the business in which the person is engaged. In the case of a bank that takes an instrument for processing for collection or payment by automated means, reasonable commercial standards do not require the bank to examine the instrument if the failure to examine does not violate the bank's prescribed procedures and the bank's procedures do not vary unreasonably from general banking usage not disapproved by this chapter or Chapter 4.

¶22. In a recent case, a Georgia court held that summary judgment was appropriate where a bank customer failed to present adequate evidence of the bank's failure to exercise ordinary care. The customer's expert witness testified that he had never analyzed fraud detection systems in the Atlanta area, that he did not know what fraud detection procedures the bank utilized, and that he did not know what, if anything, the bank and other Atlanta area banks informed their customers about fraud detection procedures. He opined that reasonable commercial standards for banks in the Atlanta area did not require banks to inspect visually every check and that no Georgia law required the bank to do so. *Spacemakers of Am., Inc. v. SunTrust Bank*, 609 S.E.2d 683, 688-89 (Ga. Ct. App. 2005).

¶23. As stated, the Georgia court held this expert testimony to be insufficient to create a question of fact for the jury. Because Rogers failed to put on *any* expert testimony pertaining to ordinary care, Union Planters' motions for directed verdict and/or JNOV should have been granted.

## CONCLUSION

¶24. The circuit court erred in denying Union Planters' motion for JNOV because, under § 75-4-406, Rogers is precluded from recovering amounts paid by Union Planters on any of the forged checks because she failed to timely detect and notify the bank of the unauthorized transactions and because she failed to show that Union Planters failed to use ordinary care in its processing of the forged checks. Therefore, we reverse the circuit court's judgment and render judgment here that Rogers take nothing and that the complaint and this action are finally dismissed with prejudice.

¶25.   **REVERSED AND RENDERED.**

**SMITH, C.J., COBB, P.J., CARLSON, DICKINSON AND RANDOLPH, JJ., CONCUR.  GRAVES, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.  EASLEY, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.  DIAZ, J., NOT PARTICIPATING.**