ROBERTS, J.,
for the Court.
¶ 1. Jay F. Swindle, Sr., and Community Bank, Ellisville, Mississippi (“the Bank”) appeal the order of the Circuit Court of Covington County that denied their motion to compel arbitration finding that the matter was not within the scope of the arbitration agreement. After a thorough review of the record and applicable case law, we find that the circuit court erred in denying the Bank’s motion to compel arbitration. Therefore, we reverse and remand the case with directions to submit all disputes to binding arbitration.
FACTS AND PROCEDURAL HISTORY
¶ 2. Ellen and Tony Harvey (“the Har-veys”) owned a total of 39.52 acres. On 36.52 acres, there were two poultry houses, and the Harveys’ home sat on the remaining three acres. The properties adjoined. In 2001, the Harveys borrowed $355,000 from Community Bank to finance their poultry operations. In 2003, Tyson, the producer for the Harveys, required the Harveys to retrofit and upgrade their poultry houses. Therefore, in June 2003, the Harveys borrowed an additional $120,000 in order to make Tyson’s required changes. The Harveys intended for the $120,000 loan to be guaranteed by the United States Small Business Adminis *565 tration. On July 18, 2003, the Harveys met with Dennis Upchurch, the senior vice-president, and Carolyn Bryant, the loan assistant for Community Bank, to execute the $120,000 loan agreement. Although, the 2003 and 2001 loan documents had the same property description, the house and three acres were inadvertently omitted in the property description on the deed of trust for both loans. The omission from the 2003 loan was the catalyst for the present litigation.
¶ 3. Unfortunately, the Harveys were unable to remain in the poultry business, and ultimately, they filed for bankruptcy in September 2005. Subsequent to the execution and filing of the bankruptcy order, Community Bank began foreclosure proceedings on the house and poultry farm. On November 28, 2005, the Harveys signed an agreed order abandoning their home and poultry farm. The Bank foreclosed its deed of trust and received a substitute trustee’s deed on April 7, 2006.
¶ 4. Following the foreclosure on May 2, 2006, the Bank received a letter from the Harveys’ attorney informing the Bank that it did not have a lien on the house and three acres. The Bank laments that after receiving the letter, it examined the documents, and for the first time, it realized that the house and three acres were not listed in the description stated on the deed of trust. However, the bank avers that it and the Harveys intended for all of the Harveys’ property to be pledged as security for the 2003 loan, including the house and three acres.
¶ 5. Although the deed of trust for the loan did not contain a reference to or description of the house and three acres, other related documents did. Undisputed by the Harveys, the Bank asserts that the following loan-related documents represent that the Harveys intended for the house and three acres to be pledged as security for the loan:
1. Promissory Note dated July 18, 2003;
2. Farm Bureau Insurance Company notices;
3. Letters from Community Bank to the Harveys informing them that their insurance had expired on the house, and the Bank was adding insurance to the loan;
4. Agreement to provide insurance;
5. Financial Statement;
6. Statement of Personal History; and
7. Commercial Security Agreement.
¶6. The Bank submits that the loan-related documents for the 2003 loan included an arbitration agreement which provided that any disputes between the parties were to go to arbitration. Furthermore, the Bank declares that Upchurch and Bryant presented all of the loan documents to the Harveys, and that Upchurch and Bryant specifically explained the arbitration disclosure and the arbitration agreement. The Harveys admit that they did not read the loan documents, either at the bank or later at home.
¶ 7. The Harveys filed suit against the Bank on April 5, 2007, requesting damages and claiming that they never intended to pledge their house and three acres as security for the loan. In reliance upon the Harveys’ loan agreement, the Bank made a motion to compel arbitration, but the circuit court denied its motion finding that the dispute was not within the scope of the arbitration clause. Even though the arbitration clause required an arbitrator to decide if an issue was arbitrable, the circuit court ruled that arbitration was not the appropriate forum to determine if the issues in the case were subject to arbitration. The circuit court further determined that the arbitration clause was either un *566 conscionable or “at least had the color of unconseionability and appealed] unfair.” The circuit court also found that because the Harveys were under financial stress at the time they made the loan, “it tend[ed] to show a lack of voluntariness” on their part, and that “by reason of said lack of voluntariness, the arbitration clause was procedurally unconscionable.” Aggrieved by the circuit court’s ruling, the Bank filed a timely appeal to this Court.
¶ 8. On appeal, the Bank argues that there is a valid arbitration agreement, and the parties agreed to arbitrate any dispute related to the 2003 loan agreement. We list verbatim the issues raised by the Bank:
I. The trial court erred in finding that the arbitration agreement is not a binding contract.
II. The trial court committed reversible error by finding that arbitration is not the appropriate forum to determine the issue of arbitrability.
III. The trial court committed reversible error in finding that the arbitration agreement was procedurally and substantively unconscionable.
IV. The trial court committed reversible error in finding that the Har-veys were under economic duress when they signed the loan documents.
V. The trial court committed reversible error in finding that the claims alleged in the complaint are outside the scope of the arbitration agreement.
Issues I, II, and V relate to the scope and validity of the arbitration agreement, so they will be addressed collectively. Issues III and IV will be addressed together, as they address the Harveys’ assertion that they were under duress at the time the loan was executed, thereby making the arbitration agreement procedurally unconscionable.
STANDARD OF REVIEW
¶ 9. “The grant or denial of a motion to compel arbitration is reviewed de novo.” East Ford, Inc. v. Taylor, 826 So.2d 709, 713(¶ 9) (Miss.2002) (citing Webb v. Investacorp, Inc., 89 F.3d 252, 256 (5th Cir.1996)). “The Federal Arbitration Act states in part that ‘an agreement in writing to submit to arbitration an existing controversy arising out of [a contract evidencing a transaction involving commerce] shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.’ ” 9 U.S.C. § 2 (2006). See Grenada Living Ctr. v. Coleman, 961 So.2d 33, 36 (¶ 8) (Miss.2007). “Courts have long recognized the existence of ‘a liberal federal policy favoring arbitration agreements.’ ” McKenzie Check Advance of Miss., LLC v. Hardy, 866 So.2d 446, 450 (¶ 7) (Miss.2004) (citation omitted). “In determining the validity of a motion to compel arbitration under the Federal Arbitration Act, courts generally conduct a two-pronged inquiry. The first prong has two considerations: (1) whether there is a valid arbitration agreement and (2) whether the parties’ dispute is within the scope of the arbitration agreement.” Taylor, 826 So.2d at 713(¶ 9). “Under the second prong, the United States Supreme Court has stated the question is ^whether legal constraints external to the parties’ agreement foreclosed arbitration of those claims.’ ” Id. at (¶ 10) (citation omitted). Also, “[u]nder the second prong, applicable contract defenses available under state contract law such as fraud, duress, and unconseionability may be asserted to invalidate the arbitration agreement without offending the Federal Arbitration Act.” Id. (citation omitted).
*567 I. WHETHER THE TRIAL COURT ERRED IN FINDING THAT THE ARBITRATION AGREEMENT WAS NOT BINDING, AND WHETHER ARBITRATION IS THE PROPER FORUM TO DETERMINE THE SCOPE OF THE ARBITRATION CLAUSE.
¶ 10. The Harveys and Community Bank are certainly not the first parties to litigate because of mistakes relating to a deed of trust. In prior cases where property was mistakenly added or omitted in a deed of trust, the supreme court has stated that “it is not what description the parties intended to write but what property the parties intended to have embraced in the description they used [that controls].” Webb v. Brown, 404 So.2d 1029, 1032 (Miss.1981) (citation omitted). In Whitefoot v. Bancorpsouth Bank, 856 So.2d 639, 643(¶14) (Miss.Ct.App.2003), the bank omitted a borrower’s house from the deed of trust, and the borrowers claimed that the bank had, therefore, waived its right to have a security interest in the house. However, this Court in Whi-tefoot determined that, notwithstanding the erroneous description, the parties’ intentions to include the house was clear beyond a reasonable doubt. Id. at (¶ 15). A review of the record substantiates that the instant case is analogous to the White-foot case, and the parties’ intentions to include the house and three acres is clear beyond a reasonable doubt.
¶ 11. In its brief to this Court, the Bank asks several rhetorical questions relating to the Harveys’ intentions concerning the loans they made with the Bank and the written bankruptcy documents. They are:
Why did the Harveys list the Bank as loss-payee on their homeowners insurance policy? Why did they abandon their homestead at the bankruptcy hearing when they represented to the Trustee under oath that they claimed no interest in the home? Why didn’t they object when the Bank force-placed insurance on their home because they failed to continue to maintain hazard insurance on their home? Why did the Harveys vacate the home if they believed they still owned it and the Bank did not have a lien on the home? Why didn’t they enjoin the foreclosure sale if they believed the Bank did not have a lien on the home?
The Harveys argue that the Bank is simply attempting to draw attention away from the fact that it did not have a valid security interest on the deed of trust entitling it to foreclosure and possession of the house and three acres, and they counter with their own questions. They ask: ‘Why did the Bank force-place insurance on the property which was not part of the deed of trust?” and “Why did the Bank go to such lengths to convince the Harveys that they had conveyed the three (3) acres via the Deed of Trust?”
¶ 12. An obvious explanation to all the questions presented is that both parties intended for the Harveys’ loan to be secured by an interest in both the house and three acres as well as the additional 36.52 acres and poultry farm. It goes against all reason to think that the Harveys would list the Bank as the loss-payee on their policy or that the Bank would force-place hazard insurance on the property, if the parties did not intend for the bank to have a security interest in the insured property. The Harveys’ failure to dispute the force-placement of hazard insurance bolsters the Bank’s assertion that both parties believed it held a security interest in the house and three acres. Even more compelling is the fact that the Harveys willingly abandoned their home after signing an agreed relinquishment of security. The Harveys contend that the omission of the property description in the deed of trust creates an *568 ambiguity that should be construed against the Bank, since the Bank drafted the documents. We now address that contention.
A. Was the error in the deed of trust an ambiguity or mutual mistake, and how should the documents be construed?
¶ 13. Arguing that the omission created an ambiguous contract, the Har-veys contend that the Bank should be responsible because it was in the better position to understand or read the legal “metes and bounds” description in the deed of trust. However, the omission is better described as a mutual mistake between the parties, rather than an ambiguity. “Prudent business men make many mistakes, and these mistakes are found under many forms and under a variety of circumstances.” Brimm v. McGee, 119 Miss. 52, 58, 80 So. 379, 381 (1919) (citation omitted). However, a mistake is not necessarily the controlling factor. The supreme court has ruled that when mistakes in property descriptions occur, reformation of the document should be allowed to reflect the parties’ intentions. See id. at 59, 80 So. at 381. Additionally, when evaluating the intention of the parties, the individual documents entered into contemporaneously should be considered integral and interrelated parts of a single global transaction, and as such, all should be construed together. Sullivan v. Mounger, 882 So.2d 129, 135(¶ 32) (Miss.2004).
¶ 14. In Doleac v. Real Estate Professionals, LLC, 911 So.2d 496, 504(¶26) (Miss.2005), the supreme court held that “under general principles of contract law, separate agreements executed contemporaneously by the same parties, for the same purposes, and as part of the same transaction, are to be construed together.” The Harveys have presented no evidence that the disputed deed of trust was not interrelated to the promissory note, the commercial security agreement, or any of the insurance documents, nor have they shown that the deed of trust was not contemporaneously executed by them and the Bank for the purpose of executing the loan. Accordingly, under the principles set forth by the supreme court in Doleac and Sullivan, the documents are to be construed as one instrument. Therefore, the arbitration agreement, contained in the loan-related documents, should be considered incorporated into the deed of trust. The Harveys rely on Union Planters Bank v. Rogers, 912 So.2d 116, 120(¶ 10) (Miss.2005) for support of their argument, that an ambiguous contract should be construed against the drafter, but Rogers is factually distinct from the instant case.
¶ 15. In Rogers, the plaintiff sued the bank for conversion after it paid forged checks drawn on her account. Id. at 118(¶ 5). One of the issues before the Rogers court was whether the lower court erred when it denied the bank’s motion to compel arbitration. Id. The supreme court held that the lower court had not erred because the bank’s arbitration agreement was ambiguous. Id. at 120 (¶¶ 10-11).
¶ 16. In Rogers, the plaintiff had four accounts with various banks prior to the merger of those banks with Union Planters. Id. at 117(¶2). After the merger, Union Planters sent out mail-outs which informed customers that by signing a signature card and continuing to use the accounts, the customers agreed to the terms of an arbitration agreement. Id. at 118(¶ 6). However, the plaintiff in Rogers never signed “a new signature card after Union Planters bought out the various banks.” Id. at 120(¶ 11). And, the four signature cards, which the plaintiff signed prior to the merger, did not contain an arbitration agreement. Id. at 120(¶ 9). The supreme court stated that “[i]ntent should first be sought in an objective read *569 ing of the words employed in the contract.” Id. at (¶ 10). The Rogers court found that the general provisions of the Union Planter’s mail-outs conflicted with the specific provisions of the arbitration clause, thereby causing ambiguity. Id. “[T]he general provisions of the mail-outs ... require[d][the] ‘use’ of the account only, whereas, the specific provisions of the arbitration clause require[d][the] ‘use’ of the account and the execution of a signature card.” Id. The court held that since the plaintiff had “not exeeute[d] a new signature card after Union Planters bought out the various banks, the arbitration clause [did] not apply to her.” Id. at (¶11).
¶ 17. This case does not involve a subsequent merger with new terms imposed upon the Harveys; rather, it deals with a contractual agreement entered into by them and the Bank at a set point in time. An objective reading of the plain language of the arbitration agreement included in the Harveys’ contract verifies that both the Harveys and the Bank contracted to have any disputes resolved by arbitration. The pertinent language of the arbitration agreement states, “any controversy concerning whether an issue is arbitrable shall be determined by the arbitrator....” The fact that the Bank failed to correctly describe its collateral on one of the loan-related documents does not defeat the Harveys’ acquiescence to the arbitration agreement. As stated, case law provides that all of the documents related to the Harveys’ loan agreement should be construed together, and the execution of the promissory note and insurance-related document coincides with the execution of the deed of trust.

B. Is arbitration the proper forum to determine the scope of the arbitration agreement?

¶ 18. Next, we address whether arbitration is the proper forum to interpret the contract’s arbitration agreement that is incorporated into the deed of trust. As stated, the deed of trust contained no arbitration agreement. Therefore, since the house and three acres were omitted from the deed of trust, the Harveys argue that the matter is outside the scope of the arbitration agreement included in the other loan documents. The circuit court agreed with the Harveys and found that the acts alleged in the Harveys’ complaint fell outside the arbitration agreement and fit squarely within the principles of Rogers-Dabbs Chevrolet-Hummer, Inc. v. Blakeney, 950 So.2d 170 (Miss.2007). Also, in the instant case, the circuit court stated “that arbitration was and is not the appropriate forum to determine if the issues in [this] case are arbitrable.” However, a careful reading of Blakeney shows that the facts of that case are distinguishable from the instant case.
¶ 19. In Blakeney, the plaintiff asserted that after purchasing a Hummer automobile from Rogers-Dabbs, he never received title to his vehicle and that one or more of Rogers-Dabb’s employees had misappropriated his name and personal information to forge vehicle titles and bills of sale in order to sell stolen vehicles. Id. at 172 (¶¶ 4-5). The Blakeney court recognized that the plaintiff had agreed to arbitrate disputes arising out of the contract for the purchase of his vehicle, but the court opined that “no reasonable person would agree to submit to arbitration any claims concerning a [vehicle] to which he would never receive a title; [or] a scheme of using his name to forge vehicle titles and bills of sale to sell stolen vehicles.... ” Id. at 177(¶ 17).
¶ 20. The instant case is different as nothing in the record indicates that a fraudulent scheme was contrived by the *570 Bank so it could finagle the Harveys’ property away from them. Although this Court is sympathetic to the Harveys’ financial plight, there is no indication that the Bank had anything to do with the circumstances which resulted in their financial demise. Relying on a fairly recent supreme court decision, we will discern whether the Harveys and the Bank agreed to have an arbitrator interpret the arbitration agreement.
¶ 21. The supreme court in Greater Canton Ford Mercury, Inc. v. Abies, 948 So.2d 417 (Miss.2007) addressed whether the proper interpreter of an arbitration agreement is an arbitrator. The Abies court opined:
The presumption in favor of arbitration does not apply to the question of [whom] should decide arbitrability, because the purpose of [the Federal Arbitration Act] was to make arbitration agreements as enforceable as other contracts, not more so[.][1] Whether a party is bound by an arbitration agreement is generally considered an issue for the courts, not the arbitrator, “[u]nless the parties clearly and unmistakably provide otherwise.” In other words, when the parties have explicitly agreed that the question of arbitrability is to be decided by an arbitrator rather than the court, that agreement must be interpreted by an arbitrator.
Id. at 422(¶ 12) (internal citations omitted) (emphasis added). The argument presented by the plaintiffs in Abies was similar to the argument in the instant appeal.
¶22. In Abies, the plaintiffs did not dispute the validity of the arbitration agreement, but they disagreed about the scope of the arbitration agreement. Id. at 421(¶ 11). The supreme court in Abies determined that “the question becomes whether the agreement clearly and unmistakably states that interpretation of the agreement will be arbitrated.” Id. at 422(¶ 14). Accordingly, we must ask if the Harveys signed an agreement that “clearly and unmistakably” mandated that arbitration would interpret the scope of arbitration. We find that they did.
¶ 23. The arbitration agreement that the Harveys signed clearly states: “Any claims shall, at the request of the customer, [or] bank, ... whether made before or after institution of legal proceedings, be determined by binding arbitration.... The arbitrator shall give effect to applicable law, [and] [a]ny controversy concerning whether an issue is arbitrable shall be determined by the arbitrator.” The agreement signed by the Harveys is comparable to the one signed by the plaintiffs in Ables. In Abies, the relevant language in the arbitration agreement stated: “Either you or [the] Creditor ... may choose at any time ... to have any [c]laim related to this contract decided by arbitration. Such claims include ... claims regarding the interpretation, scope or validity of this clause or arbitrability of any issue....” Ables, 948 So.2d at 422(¶ 14).
¶ 24. The Abies court recognized the following concerning arbitration agreements:
The United States Supreme Court has mandated that general contract principles will apply. Consequently, the general practice of allowing courts to determine the issue of arbitrability is superceded by the contractual terms of an arbitration provision which provide *571 that arbitrability will be decided by an arbitrator. The terns of the arbitration provision must be honored in a dispute over arbitrability. Therefore, arbitration of the issue of arbitrability is the mandatory result if those are the terms to which the parties have validly agreed. That premise is entirely consistent with the view of this Court. It is well established that parties may agree on the scope of arbitration in any way they desire. Contracts are solemn obligations, and the court must give them effect as written.
Id. at 422(¶ 18) (internal citation omitted) (emphasis added). The Harveys willingly entered into a contract that provided for any dispute resolution related to the contract to be handled through arbitration— even the interpretation of the agreement or the scope of arbitrability. Furthermore, the Harveys’ failure to read the contract does not relieve them from the contractual obligation to arbitrate, which they willingly entered into.
¶ 25. As stated by the supreme court:
Under Mississippi law ... parties to a contract have an inherent duty to read the terms of a contract prior to signing; that is, a party may neither neglect to become familiar with the terms and conditions and then later complain of lack of knowledge, nor avoid a written contract merely because he or she failed to read it or have someone else read and explain it.
Bailey v. Estate of Kemp, 955 So.2d 777, 783(¶ 22) (Miss.2007) (citation omitted). It bears repeating that the “cardinal rule of construction of a contract is to ascertain the mutual intentions of the parties.” Davis v. Endevco, Inc., 928 So.2d 930, 933 (Miss.Ct.App.2006) (¶ 12) (citation omitted). We now highlight the actions that illustrate the Harveys’ obvious intention to include the house and three acres as security for the loan.
¶26. When procuring the loan, the Harveys agreed to maintain hazard insurance on their home and poultry houses. Even though notified by the Bank, the Harveys did not complain when the Bank force-placed hazard insurance on the property after the Harveys allowed the insurance to lapse. The Harveys do not dispute that the arbitration agreement and arbitration disclosure statement were presented to them at the time they signed the loan documents. Following their financial demise, the Harveys represented to the Bank, their attorney, the bankruptcy trustee, and the bankruptcy judge that the Bank had a security interest in their home and poultry farm. Finally, the Harveys voluntarily relinquished and abandoned their home and poultry farm to the Bank after the property went into foreclosure. Indeed, the record strongly indicates that the Harveys and the Bank intended that the entire 39.52 acres, home, and poultry houses were to be pledged as security and that the omission of the home and three acres created a mutual mistake rather than an ambiguity. Accordingly, the deed of trust should be considered together with the other loan documents and, therefore, governed by the arbitration agreement.
II. WHETHER THE HARVEYS WERE UNDER FINANCIAL DURESS AT THE TIME THEY ENTERED INTO THE CONTRACT AND WHETHER FINANCIAL DURESS PRODUCES PROCEDURAL UNCON-SCIONABILITY.

A. Financial Duress

¶ 27. The Harveys assert that they were in a “do-or-die” situation when they borrowed the money to retrofit the poultry houses. Although, the circuit court acknowledged that the Bank was not *572 the proximate cause of the Harveys’ belief that they must “sign the[ ] documents or lose the farm,” it rationalized that because the Harveys were already in such debt to the Bank, transferring their business to another lender was not a viable option. The circuit court found that these factors tended to show a lack of voluntariness on the Harveys’ part, and because of said lack of voluntariness, the arbitration clause was procedurally unconscionable. We disagree.
¶ 28. The supreme court has addressed the invalidation of contracts based upon financial duress and has stated:
[T]o invalidate a contract on grounds of economic duress, the [complaining party] must establish: (1) that the [dominant party] threatened to do something which [it] had no legal right to do; and (2) that the wrongful threat overrode [his or her] volition ... and caused [him or her] to enter an agreement against [his or her] free will.
Bailey, 955 So.2d at 783(¶23) (citation omitted). The Harveys do not allege that the Bank threatened to deny the loan if they refused to agree to the arbitration agreement, but even if it had, that would not be sufficient to find that the Bank placed the Harveys under duress. The Fifth Circuit Court of Appeals has held that a failure to make a loan does not equal duress, nor does the threat to break a contract, in and of itself, constitute duress. See McCallum Highlands, Ltd. v. Washington Capital Dus, Inc., 66 F.3d 89, 92 (5th Cir.1995) (citation omitted). In the same vein, the supreme court has held that “[i]n the absence of a contractual obligation ... threatening] not to co-sign [a loan] ... [is] not ‘wrong[ ].’ ” Kelso v. McGowan, 604 So.2d 726, 732 (Miss.1992). In other words, “[i]t is never duress to threaten to do that which a party has a legal right to do.” Id. The Bank contends, and it is not disputed by the Harveys, that Ms. Harvey testified that she and her husband could have gone to another bank to obtain financing for the upgrades to their chicken houses. Whether they could or not, the record is devoid of facts which would support a finding that the Bank placed the Harveys under financial duress. It appears from the briefs of the parties that any duress the Harveys were under resulted from the changes required by Tyson or other circumstances, not the Bank’s actions. We are sympathetic to the fact that the Harveys may have been placed between a rock and a hard place, but the Bank did not act outside its legal boundaries. The Harveys have failed to prove the first element set forth in Bailey: that the Bank “threatened to do something which [it] had no legal right to do.” Bailey, 955 So.2d at 783(¶ 23). Therefore, we find it unnecessary to address the second element set forth in Bailey, which is whether the Bank’s actions overrode the Harveys’ free will or volition and caused them to enter into an agreement against their will. Id. Accordingly, we disagree with the circuit court’s determination that the Bank presented the Harveys with a “heads-I-win-tails-you-lose” situation, nor do we agree that the Harveys were compelled to sign a procedurally unconscionable arbitration agreement.

B. Procedural Unconscionability

¶ 29. “Procedural unconscion-ability may be proved by showing ‘a lack of knowledge, lack of voluntariness, inconspicuous print, the use of complex legalistic language, disparity in sophistication or bargaining power of the parties and/or a lack of opportunity to study the contract and inquire about the contract terms.’ ” Taylor, 826 So.2d at 714(¶ 13) (citation omitted). “Procedural unconscionability looks beyond the substantive terms which specifically define a contract and focuses *573 on the circumstances surrounding a contract’s formation.” Cmty. Care Ctr. of Vicksburg, LLC v. Mason, 966 So.2d 220, 229(¶ 24) (Miss.Ct.App.2007) (citation omitted). The Harveys have a twelfth grade education, and they are competent to read and write. They have made no claims that they did not understand the contract; they simply did not read it. The Bank did not do or threaten to do that which it was not legally allowed to do. If any outside force placed the Harveys under financial duress, it does not appear from the record that the Bank was the entity to do so, nor does it appear that the Harveys lacked an opportunity to study the contract or inquire about the terms. Accordingly, we find that the arbitration agreement is not unconscionable.

C. Lack of Consideration Given by the Bank

¶ 30. The Harveys assert that the arbitration agreement fails because the Bank did not give consideration for their waiver of their constitutional right to present any disputes to a court of competent jurisdiction. Albeit a creative argument, it fails. The Harveys correctly stated the elements of a valid contract, and they are: “(1) two or more contracting parties, (2) consideration, (3) an agreement that is sufficiently definite, (4) parties with legal capacity to make a contract, (5) mutual assent, and (6) no legal prohibition precluding contract formation.” Rotenberry v. Hooker, 864 So.2d 266, 270(¶ 13) (Miss.2003) (citation omitted). The Har-veys have presented no support for their position that the arbitration agreement, which was included in the contract, was a contract in and of itself that required additional consideration in order to be valid. Rather from the briefs presented to this Court, it appears that it is a run-of-the-mill arbitration agreement that is included in numerous contracts of recent years. Furthermore, undisputed by the Harveys, the Bank asserts that the Harveys failed to raise this issue in the circuit court, and the Bank correctly states that “an issue not raised before the lower court is deemed waived and is procedurally barred.” Gale v. Thomas, 759 So.2d 1150, 1159(¶40) (Miss.1999) (citation omitted). We find the Harveys’ lack-of-consideration argument is without merit.
CONCLUSION
¶ 31. Based upon the foregoing reasons, we find that the Harveys entered into a valid arbitration agreement, and the arbitration agreement provided that even the interpretation of the contract was to be arbitrated. There is no evidence in the record that there are any legal constraints external to the Harveys’ agreement that would foreclose arbitration of the Harveys’ claim. We further find that the Harveys expressly and voluntarily agreed to waive their right to bring this matter before a court of competent jurisdiction.
¶ 32. THE JUDGMENT OF THE CIRCUIT COURT OF COVINGTON COUNTY IS REVERSED, AND THIS CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE AP-PELLEES.
KING, C.J., LEE AND MYERS, P.JJ, IRVING, GRIFFIS, BARNES, ISHEE, CARLTON AND MAXWELL, JJ., CONCUR.

. The "Federal Arbitration Act dictates that arbitration agreements 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.' " Blakeney, 950 So.2d at 173(¶ 12) (citations omitted). "[T]he Act establishes] a strong federal policy favoring arbitration.” Id.